**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE STATE STREET BANK AND TRUST CO. FIXED INCOME FUNDS INVESTMENT LITIGATION | : : : : : | Civil Action No. 08-md-1945 |

| | |
|---|---|
| NING YU, On Behalf of Himself and All Others Similarly Situated,<br><br>            Plaintiffs,<br><br>      v.<br><br>STATE STREET CORPORATION, et al.,<br><br>            Defendants. | : : : : : : : : : : : : | Civil Action No. 08-cv-08235-RJH (Relates to 08-md-1945) |

| | |
|---|---|
| PLUMBERS AND STEAMFITTERS UNION LOCAL NO. 10 HEALTH & WELFARE, Individually and on Behalf of All Others Similarly Situated,<br><br>            Plaintiffs,<br><br>      v.<br><br>STATE STREET CORPORATION, et al.,<br><br>            Defendants. | : : : : : : : : : : : : : | Civil Action No. 08-cv-07934-RJH (Relates to 07-cv-8488) |

## STATE STREET'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS CLASS ACTION SECURITIES COMPLAINTS

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ......................................................................................................3

    A.    The Registration Statements Contained Detailed Descriptions Of The
Funds' Strategies, Risks And Holdings Specifically Related To The
Funds' Investments In Mortgage-Related Securities...................................4

    B.    The Funds' Annual Reports Contained Detailed Schedules Of Investments
That Itemized The Funds' Holdings In Mortgage-Related Securities......................7

    C.    The Funds' Investment Losses Were Directly Linked To Fully Disclosed Risks......8

ARGUMENT ..........................................................................................................9

I.    THE COMPLAINTS DO NOT ALLEGE MISREPRESENTATIONS OR
OMISSIONS IN THE REGISTRATION STATEMENTS THAT ARE
ACTIONABLE AS A MATTER OF LAW...................................................................10

    A.    The Funds' "Descriptions" In The Prospectuses Were Accurate And
Not Misleading As A Matter Of Law .................................................................12

         1.    The Yield Plus Fund's Disclosed Objective To Seek "High Current
Income" From A "Diversified Portfolio Of High-Quality Debt
Securities" Was Not Misleading ...................................................................12

         2.    The Intermediate Fund's Disclosed Objective To Match Or Exceed
The Return Of The Lehman Brothers Intermediate Government/Credit
Index Was Not Misleading ...........................................................................16

    B.    The Funds Did Not Omit Or Misrepresent Their "Exposure" To
Mortgage-Related Securities .............................................................................18

    C.    The Complaints Do Not State Actionable Claims That The Funds
Misrepresented The "Value" Of Portfolio Securities .............................................20

         1.    The Plaintiffs' Conclusory Allegations Of Overstated Valuations Do
Not Plead Actionable Falsity .........................................................................21

         2.    The Prospectuses' Descriptions Of The Funds' Pricing Methodology
Are Protected By The Bespeaks Caution Doctrine .........................................25

         3.    The Plaintiffs' Conclusory Allegations Of Overstated Valuations Are
Not Pled With The Requisite Particularity......................................................26

    D.    The Certifications Signed By Defendants Ross And Swanson And
Attached To The Funds' Periodic Reports Did Not Contain Any Untrue
Statements Of Material Fact .............................................................................29

II.    THE PLAINTIFFS' SECTION 11 AND 12(A)(2) CLAIMS ALSO FAIL
       BECAUSE THEIR ALLEGED LOSSES ARE NOT CAUSALLY CONNECTED
       TO THE ALLEGED MISSTATEMENTS OR OMISSIONS ...........................................29

III.   THE PLAINTIFFS' SECTION 12(A)(2) CLAIMS MUST BE DISMISSED
       AGAINST STATE STREET CORPORATION, SSGA, AND INDIVIDUAL
       DEFENDANTS LEAHY, ROSS AND SWANSON BECAUSE THESE
       PARTIES ARE NOT "SELLERS" OF THE FUNDS ........................................................32

IV.    THE "CONTROL PERSON" CLAIMS UNDER SECTION 15 MUST BE
       DISMISSED ........................................................................................................34

       A.    The Plaintiffs Have Not Alleged A Primary Violation ...........................................34

       B.    The Plaintiffs Fail To Allege That Individual Defendants Leahy, Ross and
             Swanson Exercised Actual Control Over Any Allegedly Controlled Entity............34

CONCLUSION.................................................................................................................36

# TABLE OF AUTHORITIES

## CASES

*ATSI Commc'ns v. Shaar Fund*,
  493 F.3d 87 (2d Cir. 2007) ........................................................................................ passim

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 127 S. Ct. 1955 (2007) ................................................................... 9, 22

*Bernstein v. Crazy Eddie, Inc.*,
  702 F. Supp. 962 (E.D.N.Y. 1988) ................................................................................ 33

*Clark v. Nevis Capital Mgmt., LLC*,
  No. 06 CV 1625(JG), 2005 WL 488641 (S.D.N.Y. Mar. 2, 2005) ......................... 30

*Coronel v. Quanta Capital Holdings, Ltd.*,
  No. 7 Civ. 1405(RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ................. 9, 24

*De Jesus v. Sears, Roebuck & Co.*,
  87 F.3d 65 (2d Cir. 1996) ............................................................................................. 10

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ................................................................................................ 30, 31

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000) ......................................................................................... 24

*Garber v. Legg Mason, Inc.*,
  537 F. Supp. 2d 597 (S.D.N.Y. 2008) ......................................................................... 22

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002) .................................................................................. 11, 25

*Hinerfeld v. United Auto Group*,
  No. 97 Civ. 3533(RPP), 1998 WL 397852 (S.D.N.Y. July 15, 1998) ................... 11

*Hunt v. Alliance N. Am. Gov't Income Trust Inc.*,
  159 F.3d 723 (2d Cir. 1998) ......................................................................... 15, 16, 17

*In re AIG Advisor Group*,
  No. 06 CV 1625(JG), 2007 WL 1213395 (E.D.N.Y. Apr. 25, 2007) ..................... 26

*In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.*,
  No. 95 Civ. 0330(LMM), 1996 U.S. Dist. LEXIS 14209 (S.D.N.Y. Sept. 26, 1996) .................
  ................................................................................................................. 15, 16, 20

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006)......................................................................28

*In re CIT Group, Inc. Sec. Litig.*,
   349 F. Supp. 2d 685 (S.D.N.Y. 2004).................................................................24, 27

*In re Countrywide Financial Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (N.D. Cal. 2008) ................................................................32

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   352 F. Supp. 2d 429 (S.D.N.Y. 2005)....................................................................24

*In re Gas Reclamation, Inc. Sec. Litig.*,
   733 F. Supp. 713 (S.D.N.Y. 1990).........................................................................33

*In re Global Crossing, Ltd. Sec. Litig.*,
   No. 02 Civ. 910(GEL), 2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005)....................34

*In re IPO Sec. Litig.*,
   241 F. Supp.2d 281 (S.D.N.Y. 2003)......................................................................35

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003).....................................................................32

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   289 F. Supp. 2d 429 (S.D.N.Y. 2003).....................................................................29

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*,
   No. 03 Civ. 8208, 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006)......................11, 30

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
   441 F. Supp. 2d 579 (S.D.N.Y. 2006)..................................................................11, 30

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
   382 F. Supp. 2d 1173 (N.D. Cal. 2004) ..............................................................23, 31

*In re Worldcom, Inc. Sec. Litig.*,
   02 Civ. 3288(DLC), 03 Civ. 0890, 2004 WL 1097786 (S.D.N.Y. May 18, 2004) ................35

*Iqbal v. Hasty*,
   490 F.3d 143 (2d Cir. 2007)....................................................................................10

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
   No. 7 Civ. 0976(LAP), 2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008)...................27

*Leeds v. Meltz*,
   85 F.3d 51 (2d Cir. 1996) .......................................................................................10

*Lentell v. Merrill Lynch & Co.*,
   396 F. 3d 161 (2d Cir. 2005)............................................................................30, 31

*Lin v. Interactive Brokers Group, Inc.*,
   574 F. Supp. 2d 408 (S.D.N.Y. 2008)........................................................10, 11, 26

*Luce v. Edelstein*,
   802 F.2d 49 (2d Cir. 1986)...........................................................................................27

*Mabon, Nugent & Co. v. Borey*,
   127 B.R. 727 (S.D.N.Y. 1991).....................................................................................33

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
   98 F.3d 2 (2d Cir. 1996)..........................................................................................11, 25

*Pani v. Empire Blue Cross Blue Shield*,
   152 F.3d 67 (2d Cir. 1998)....................................................................................29, 30

*Parisi v. Coca-Cola Bottling Co. of N.Y.*,
   995 F. Supp. 298 (E.D.N.Y. 1998) ............................................................................21

*Pinter v. Dahl*,
   486 U.S. 622 (1988)......................................................................................................33

*Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co.*,
   794 F. Supp. 1265 (S.D.N.Y. 1992)...........................................................................33

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)................................................................................25, 26, 27

*Royal American Managers, Inc. v. IRC Holding Corp.*,
   885 F.2d 1011 (2d Cir. 1989)......................................................................................34

*SEC v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir.1996).......................................................................................34

*Sellin v. Rx Plus, Inc.*,
   730 F. Supp. 1289 (S.D.N.Y. 1990)...........................................................................34

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996).......................................................................................33

*Sheppard v. TCW/DW Term Trust 2000*,
   938 F. Supp. 171 (S.D.N.Y. 1996).............................................................................11

*Spielman v. Gen. Host Corp.*,
   402 F. Supp. 190 (S.D.N.Y. 1975).............................................................................24

*Steinberg v. PRT Group, Inc.*,
   88 F. Supp. 2d 294 (S.D.N.Y. 2000) ........................................................................11

*Young v. Nationwide Life Ins. Co.*,
   183 F.R.D. 502 (S.D. Tex. 1998) ..............................................................................31

## STATUTES

15 U.S.C. § 77z-2(c) ...................................................................................................25

15 U.S.C. § 77k(e) ......................................................................................................29

15 U.S.C. § 77*l*(b) ......................................................................................................29

15 U.S.C. § 77*l*(a)(2) ..................................................................................................32

15 U.S.C. § 78t(a) .......................................................................................................35

## OTHER AUTHORITIES

17 C.F.R. § 240.12b-2 .................................................................................................34

17 C.F.R. § 270.22c-1(b) .............................................................................................21

Christopher Condon & Jody Shenn, *Evergreen Liquidating Ultra-Short Fund After 18%
   Drop* ...........................................................................................................................9

Fed. R. Civ. P. 12(b)(6) .................................................................................9, 10, 29, 30

Fed. R. Civ. P. 8 ................................................................................................22, 24, 35

Fed. R. Civ. P. 9(b) ...........................................................................................26, 27, 28

RESTATEMENT (SECOND) OF TORTS § 548A cmt b (1977) ............................................31

Tom Petruno, *Market Beat: Wall Street Can't Cage Its Mortgage Monster* ...................9

## PRELIMINARY STATEMENT

These are putative securities class actions that allege that Prospectuses for two mutual funds were false and misleading in violation of the Securities Act of 1933, as amended (the "Securities Act").

The plaintiffs complain that the net asset value of the SSgA Yield Plus Fund and the SSgA Intermediate Fund declined when values for mortgage-related debt instruments fell at the outset of the global financial crisis in mid-2007.  But the pleadings do not causally connect this underlying systemic market failure to their claimed damages.  Rather, the complaints allege that the investors' losses were "caused" by misleading statements in the Funds' Prospectuses.

Specifically, the plaintiffs claim that the Funds' "descriptions" of their respective investment objectives left them ignorant about the Funds' portfolio compositions.  They assert that the Prospectuses misrepresented the Funds' "exposure" to mortgage-related assets.  And the plaintiffs complain that the Funds' net asset "values" were wrong – though when, by how much, or why they omit to say.  In short, the plaintiffs protest that they were somehow misled into believing that the Funds would *not* invest in mortgage-related securities, and were exempt from the risks associated with exposure to that type of debt instrument.

But that essential contention is incompatible with the actual disclosures in the Funds' Prospectuses.

The Registration Statements explicitly informed investors that the Funds would invest in mortgage-related debt securities.  Indeed, the Prospectuses advised purchasers that the use of such instruments was a "principal" means of executing upon the Funds' strategies.[1]  Documents

---

[1] *See* Declaration of Robert A. Skinner ("Skinner Declaration"), dated March 11, 2009, ¶  2, Ex. A at 4-5 (2006 Combined Prospectus covering both Funds) (the "Prospectus").  The language concerning the relevant disclosures is virtually identical in each of the filings throughout the

that the Prospectuses incorporated by reference, and that were provided to all existing shareholders periodically, not only disclosed the classes of debt securities the Funds owned, but also itemized each specific security in the Funds' portfolios on a periodic basis.   The Prospectuses also specifically alerted investors to the risks of the Funds' investments in mortgage-related securities, including that "sector" investment in particular types of securities increased risks, that potential development of an illiquid market for the Funds' securities posed the possibility of substantial price declines, the possibility that defaults on underlying loans could impair these securities' values, and that interest rates and other variables could enhance volatility.   *See, e.g.*, Prospectus at 4-5, 15, 18-19, 43, 48; SAI at 3-4.   As a result, no investor who actually read the Funds' Prospectuses and periodic reports could conceivably claim to be in the dark about either the Funds' intent to buy mortgage-related securities, the purpose for using those instruments, the scope of the Funds' exposure to that asset type, or the risks attendant to any portfolio security.

The plaintiffs' pleadings flatly ignore these actual disclosures.   But a securities law complaint cannot disregard prospectus text; that is what a Securities Act claim is all about.   Here, the complaints isolate cryptic sentence fragments and short passages, but the pleadings do not tether the phrases they challenge to context.   Rather, the complaints seize upon ultimate results, presume without a factual anchor that those outcomes were somehow preordained, and chalk the consequence up to supposed misleading statements.   The logic to the plaintiffs' claims of misrepresentation is unrelated to the words of the Prospectuses.   It depends instead exclusively on the fact that investors ultimately incurred losses.   But that would have happened no matter

putative class period.  Unless otherwise noted, language quoted from the Funds' Prospectuses and Statements of Additional Information ("SAI") appeared in the Funds' December 2006 filings.  *See id.* and Skinner Declaration ¶ 3, Ex. B (2006 Combined SAI covering both Funds) (the "SAI").

what the Prospectuses said.  The failure to connect the dots between the document and the damage is dispositive of a securities law claim.

As set forth below, the plaintiffs' complaints do not plead a cognizable claim under the Securities Act, and the Amended Complaints should be dismissed in their entirety.

## BACKGROUND

Defendant State Street Corporation is a world leader in providing financial services to institutional investors.  The products and services it provides include investment management, investment servicing and specialized investment research.[2]  Defendant SSgA Funds is a registered investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act") and a Massachusetts business trust.  Individual defendants Peter G. Leahy, James Ross and Mark E. Swanson are  trustees and/or officers of SSgA Funds.

The plaintiffs invested in the SSgA Yield Plus Fund and the SSgA Intermediate Fund, each a series of SSgA Funds.  The lead plaintiff in the *Yu* action, Anatoly Alexander, purportedly acquired shares of the Yield Plus Fund "pursuant to and/or traceable to" several amendments to that Fund's Registration Statement filed with the Securities and Exchange Commission ("SEC") and claims to represent a class of persons and entities who purchased shares of the Fund between July 1, 2005 and June 30, 2008.  Yu Compl. ¶¶ 1, 5.  Plaintiff in the *Plumbers* action, Plumbers and Steamfitters Union Local No. 10 Health & Welfare Fund, allegedly acquired shares of the Intermediate Fund "pursuant and/or traceable to" several amendments to that Fund's Registration Statement filed with the SEC and claims to represent a class of persons and entities who purchased shares of the Fund between September 12, 2005 and September 11, 2008.  Plumbers Compl. ¶¶ 1, 5.  The plaintiffs claim that they have been "damaged," and both complaints allege

---

[2] Defendant State Street Global Advisors ("SSgA") is an unincorporated division of State Street Corporation and therefore not a proper defendant.

violations of Sections 11, 12(a)(2), and 15 of the Securities Act.  Yu Compl. ¶¶ 5, 88-107; Plumbers Compl. ¶¶ 5, 83-102.  The plaintiffs allege that the Funds' Registration Statements were materially false and misleading in three fundamental respects.  The pleadings assert that the Prospectuses' "descriptions" of the Funds were inaccurate,  Yu Compl. ¶¶ 58-59; Plumbers Compl. ¶¶ 58-59; that the "values" of the Funds were misstated, Yu Compl. ¶¶ 63-66; Plumbers Compl. ¶¶ 61-64; and that the Funds' "exposure" to "risky" mortgage-related securities was misrepresented.  Yu Compl. ¶¶ 67-72; Plumbers Compl. ¶¶ 65-70.

Mutual fund disclosures are closely regulated by the SEC.  Each year, SSgA Funds files with the SEC an amendment to the SSgA Funds' Registration Statement, containing the combined Prospectuses and SAI for all of the mutual funds offered by SSgA Funds.  The amendment is often supplemented or reissued between the yearly filings.  Each year, SSgA Funds also publishes Annual Reports, dated as of August 31.  The Prospectuses, SAI and Annual Reports are all incorporated by reference and deemed to be part of the Funds' Registration Statement, the contents of which are governed by the Securities Act, the Investment Company Act and other statutes and rules.  The comprehensive disclosures for the Yield Plus Fund and the Intermediate Fund relating to the Funds' investments in mortgage-related securities are described below.

### A.    *The Registration Statements Contained Detailed Descriptions Of The Funds' Strategies, Risks And Holdings Specifically Related To The Funds' Investments In Mortgage-Related Securities*

The Prospectuses' opening descriptions of each Fund alerted investors to the fact that the Funds' strategies involved significant exposure to mortgage-backed and other asset-backed securities.  The Prospectuses' opening statement describing the Yield Plus Fund announced that: (1) the Fund intended to meet its objective by investing in "mortgage related securities" and "asset-backed securities;" (2) "asset-backed" and "mortgage-backed" securities were considered

"principal" to the achievement of the Fund's investment objective; (3) there were corresponding disclosures of risks associated with investing in asset-backed and mortgage-backed securities; and (4) one of the relevant risk factors was "sector" risk, associated with funds that may invest significant portions of their assets in particular types of securities.  *See* Prospectus at 4.[3]  The Prospectuses' opening statements describing the Intermediate Fund likewise emphasized that asset-backed and mortgage-backed securities were "principal" to the achievement of the Fund's investment objective, and the Prospectuses disclosed that risks associated with asset-backed securities, mortgage-backed securities and sector investment were all present in the Fund.  *Id.* at 5.

Additionally, the Prospectuses' opening statements referred investors to later sections, which delved deeper into the Funds' principal investment strategies and risks.  These later sections, and the SAI, contained various general investment risk disclosures, as well as detailed descriptions and comprehensive definitions that contained information about the risks associated with the Funds' exposure to mortgage-backed and other asset-backed securities.  For example:

- The definition of "sector risk" alerted investors that the Funds were "subject to greater risk of loss as a result of adverse economic, business or other developments than if [their] investments were diversified across different industry sectors.  Securities of issuers held by [the Funds] may lack sufficient market

---

[3] "Asset-Backed Securities" comprise an open-ended category of obligations "whose principal and interest payments are collateralized by pools of assets."  Prospectus at 43.  Those asset pools include residential mortgages, as well as other asset types such as student loans, credit cards, commercial mortgages and auto loans.  *See, e.g.*, Prospectus at 43, Skinner Declaration, ¶ 4, Ex. C (2006 Annual Report covering both Funds, dated August 31, 2006) (the "2006 Annual Report") at 8-12, 35-44.  By contrast, "Mortgage-Backed Securities" are a more specifically-defined category of instruments, including those backed by "first deeds of trust or other similar security instruments" of certain defined types of properties.  *See* Prospectus at 48; discussion *infra* at 19.

liquidity to enable [the Funds] to sell the securities at an advantageous time or without a substantial drop in price." *Id.* at 19. [4]

• The SAI warned investors that the "value of asset-backed securities is affected by changes in the market's perception of the asset backing the security" and "the market-value of mortgage-related securities depends on, among other things . . . the payment history of the underlying borrowers." SAI at 3-4.

• The Prospectuses' definition of asset-backed securities defined not only what that term meant ("[a]sset-backed securities are securities whose principal and interest payments are collateralized by pools of assets"), but also warned of specific risks affiliated with asset-backed securities, including: "if any required payments of principal and interest are not made with respect to the underlying loans, the fund may experience loss or delay in receiving payment and a decrease in the value of the security." Prospectus at 43.

• The description of "mortgage-backed securities risk" cautioned that "[t]he investment characteristics of mortgages differ from those of traditional fixed-income securities. These differences can result in significantly greater price and yield volatility than is the case with traditional fixed-income securities." *Id.* at 18.

• Further, the description of "asset-backed securities risk" explicitly stated that "[d]efaults on the underlying assets may impair the value of an asset-backed security." *Id.* at 15.

---

[4] The type of market illiquidity addressed by sector risk should not be confused with the certain, limited, class of securities defined as illiquid by nature. *See., e.g.*, SAI at 5; 2006 Annual Report at 68.

**B.**       ***The Funds' Annual Reports Contained Detailed Schedules Of Investments That Itemized The Funds' Holdings In Mortgage-Related Securities***

Further, the Funds' Annual Reports included schedules of investments that listed all the securities held by the Funds as of the dates of the Reports.[5]   These schedules displayed the securities broken out into several categories of holdings – including "Asset-Backed Securities" and "Mortgage-Backed Securities" – with the full name of each security provided underneath the appropriate category heading.   It was evident from these schedules that the Funds were significantly invested in asset-backed and mortgage-backed securities, and that both of these categories contained securities tied to mortgage-related assets.   For example, the 2006 Annual Report for the Yield Plus Fund noted that 68.3% of the Fund was invested in asset-backed securities and 11.3% in mortgage-backed securities.   2006 Annual Report at 12.   The fact that mortgage-related assets comprised a significant portion of the Yield Plus Fund's "Asset-Backed Securities" category was apparent from the names of the listed securities, which included descriptions such as "New Century Home Equity Loan Trust," "Novastar Home Equity Loan" and "Ownit Mortgage Loan Asset Backed Certificates."   *Id.* at 9-10.   The 2006 Annual Report for the Intermediate Fund provided an equally clear picture of that Fund's holdings.   The Annual Report disclosed that 22.0% of the Fund was invested in asset-backed securities and 36.0% in mortgage-backed securities.   *Id.* at 44.   As with the Annual Report for the Yield Plus Fund, the presence of housing-related securities in the "Asset-Backed Securities" category was obvious

---

[5] During the putative class periods, SSgA Funds also issued semi-annual reports.  These reports were not specifically incorporated into the Registration Statements by reference; however, they regularly provided investors with detailed schedules of the Funds' holdings.

given the named securities, which included descriptions such as "Option One Mortgage Loan Trust" and "Soundview Home Equity Loan Trust." *Id.* at 34-35.[6]

The Annual Reports for the Funds also disclosed that they held mortgage-related securities in a category titled "International Debt." This category, for each Fund, was comparatively smaller than each Fund's combined holdings in asset-backed and mortgage-backed securities. The assets listed under the "International Debt" category consisted of a variety of debt instruments, all of which were permitted investments for the Funds. Some of these securities were linked to foreign mortgage investments (*e.g.*, those issued by "Granite Mortgages PLC"), but some were not (*e.g.*, "Kowloon Canton Railway Corp."). *Id.* at 10, 40. However, as with the asset-backed and mortgage-backed securities categories, the name of each individual holding was disclosed.

### C. The Funds' Investment Losses Were Directly Linked To Fully Disclosed Risks

There is a direct causal link between the risks disclosed in the Funds' Registration Statements and the Funds' declines in net asset value. The Funds' were affected by the very market forces that the Prospectuses and SAI warned could result in losses. The suddenly illiquid market for mortgage-related securities and the market's perception of the assets backing these securities both were significant factors in the Funds' declines in net asset values. As disclosed in the Prospectuses and the SAI, if an entire market sector suffers a downturn, the Funds may be

---

[6] It is also evident from the security names that not all of either Funds' Asset-Backed Securities category consisted of mortgage-related issues. For example, the Asset-Backed Securities category for the Yield Plus Fund included securities with descriptions such as "BA Master Credit Card Trust" and "SMS Student Loan Trust." 2006 Annual Report at 9-10. Similarly, the Intermediate Fund's Asset-Backed Securities category included securities with descriptions such as "GE Capital Credit Card Master Note Trust" and "Toyota Motor Credit Corp." *Id.* at 35.

forced to sell assets at a loss due to the absence of market liquidity.[7]  The values of the Funds' asset-backed and mortgage-backed securities also declined due to pressure caused by the failure of underlying loan holders to make principal and interest payments and outright defaults on the underlying assets – risks that the Prospectuses and SAI fully disclosed with respect to asset-backed and mortgage-backed securities.[8]

## ARGUMENT

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must grant a motion to dismiss where the allegations of the complaint fail to provide "'plausible grounds' for the allegations with 'enough fact to raise a reasonable expectation that discovery will reveal evidence' to support them."  *Coronel v. Quanta Capital Holdings, Ltd.*, No. 7 Civ. 1405(RPP), 2009 WL 174656, at *10 (S.D.N.Y. Jan. 26, 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007)); *see also ATSI Commc'ns v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim

---

[7] As reported in the Funds' 2007 Annual Report: "As a result of negative reports regarding the residential mortgage backed securities market, market participants, looking to reduce their exposure to this sector, sold higher quality securities where valuations were most favorable. The combination of these events resulted in severe illiquidity in this sector."  Skinner Declaration, ¶ 5, Ex. D (2007 Annual Report covering both Funds, dated August 31, 2007) (the "2007 Annual Report") at 6, 30; *see also* Christopher Condon & Jody Shenn, *Evergreen Liquidating Ultra-Short Fund After 18% Drop*, Bloomberg.com, June 19, 2008, Ex. 1 to Memorandum in Support (noting that the Wachovia Fund's decline "points to the difficulty asset managers have in pricing illiquid securities").

[8] As reported in the Funds' 2007 Annual Report: "The Fund experienced underperformance due to its holdings in primarily high credit quality instruments related to mortgage and home-equity payments . . . .  In July and August of 2007, the AAA and AA rated sectors of this market experienced significant price depreciation," 2007 Annual Report at 6 (discussing the Yield Plus Fund); "The Fund experienced underperformance due to its holdings of corporate and securitized debt, especially instruments related to mortgage and home-equity payments," *id.* at 20 (discussing the Intermediate Fund).  *See also* Tom Petruno, *Market Beat: Wall Street Can't Cage Its Mortgage Monster*, L.A. TIMES, July 22, 2007, at C-1, *available at* 2007 WLNR 13980731 (noting that bonds heavily invested in mortgage-backed securities were devalued due to loan delinquencies on the underlying assets).

rests through factual allegations sufficient to raise a right to relief above the speculative level." (internal quotation marks omitted)). *Twombly* "require[s] a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007). While the court must take all well-pleaded facts as true in deciding a motion to dismiss under Rule 12(b)(6), "[a]llegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99; *see also De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." (internal quotation marks omitted)); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996) ("While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice.").

## I.   THE COMPLAINTS DO NOT ALLEGE MISREPRESENTATIONS OR OMISSIONS IN THE REGISTRATION STATEMENTS THAT ARE ACTIONABLE AS A MATTER OF LAW

The plaintiffs allege that the Funds' Registration Statements were materially false and misleading, and violated Sections 11 and 12(a)(2) of the Securities Act, in three fundamental respects. The pleadings assert that the Prospectuses' "descriptions" of the Funds were inaccurate, Yu Compl. ¶¶ 58-59; Plumbers Compl. ¶¶ 58-59; that the "values" of the Funds were misstated, Yu Compl. ¶¶ 63-66; Plumbers Compl. ¶¶ 61-64; and that the Funds' "exposure" to "risky" mortgage-related securities was misrepresented, Yu Compl. ¶¶ 67-72; Plumbers Compl. ¶¶ 65-70. But plaintiffs' claims that State Street failed adequately to disclose the Funds' investment objectives, portfolio compositions and risk profiles are flatly contradicted by the text of the Registration Statements. The Funds' Registration Statements amply disclosed the information the plaintiffs contend was withheld, and did so in language that could not plausibly have misled investors. *See Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 418

(S.D.N.Y. 2008) (dismissing claims where alleged material information "was fully and accurately disclosed in the Offering Documents").[9]

To make their case, the plaintiffs isolate selective quotations from the Registration Statements.  But allegedly misleading statements must be read in their full context.  An actionable claim arises only if the relevant disclosure documents read as a whole could have misled a reasonable investor about the securities offered.  *See Lin*, 574 F. Supp. at 416 ("In evaluating claims under Sections 11 and 12(a)(2), the court must review the Offering Documents as a whole rather than determining whether individual statements are true.").[10]  Viewed in the context of the entire "mix of information" in the Registration Statements, none of the misstatements or omissions alleged by the plaintiffs can reasonably be read to have misled investors about the nature or risk of their investment in the Funds.

---

[9] *See also In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 590 (S.D.N.Y. 2006) (dismissing plaintiff's claims "where Defendants at all times disclosed" the allegedly omitted material information); *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208, 2006 WL 1008138, at *9 (S.D.N.Y. Apr. 18, 2006) (holding in mutual fund case that plaintiffs failed to state claim where all alleged material information was "disclosed in the offering prospectuses, which are incorporated by reference into the consolidated amended complaint"); *Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000) ("If a plaintiff's claims of misstatement or omission conflict with the plain language of the prospectus, the prospectus controls and the court need not accept as true the allegations of the complaint."); *Hinerfeld v. United Auto Group*, No. 97 Civ. 3533(RPP), 1998 WL 397852, at *4 (S.D.N.Y. July 15, 1998) ("If the plaintiffs' claims of misleading disclosures are contradicted by disclosures made on the face of the prospectus, then no additional facts can prove the claims and dismissal is proper.").

[10] *See also Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (where cautionary language is present, the "touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered"); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) ("It is undisputed that the prospectuses must be read 'as a whole.'"); *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 179 (S.D.N.Y. 1996) ("In sum, the prospectus clearly 'bespeaks caution' in that the various risks inherent in purchasing shares in the Trust were adequately disclosed.  Indeed, the disclosures warned potential investors about the very contingency that came to pass . . . .").

A.    **The Funds' "Descriptions" In The Prospectuses Were Accurate And Not Misleading As A Matter Of Law**

In both complaints, the plaintiffs' very first allegation is that the Prospectuses' "descriptions" of each Fund was misleading.  In neither case can the complete "descriptions" of the Fund and its objective have misled an investor.

1.    *The Yield Plus Fund's Disclosed Objective To Seek "High Current Income" From A "Diversified Portfolio Of High-Quality Debt Securities" Was Not Misleading*

The *Yu* plaintiffs contend that the Prospectuses' "description" of the Yield Plus Fund's investment objective – to seek "high current income" by "investing primarily in a diversified portfolio of high-quality debt securities" – was misleading because the Fund was "heavily invested" in "risky" mortgage-related investments.  *See* Yu Compl. ¶¶ 58-60.  The pleading juxtaposes the label "high-quality" with the pejorative adjective "risky" that it attaches to mortgage-related securities, and tacitly proclaims the concepts incompatible.  The plaintiffs leap to a conclusion of misrepresentation by contending that the "high-quality" description of the intended portfolio misled investors into believing that the Fund would have limited exposure to mortgage-backed instruments.  But that is a non-sequitur.  The plaintiffs divorce the phrase "diversified portfolio of high-quality debt securities" from the balance of the Registration Statements; indeed, their contention disassociates that sentence fragment even from the rest of the introductory section in which it appears.

By its terms, the description of the Fund's intent to invest in a "diversified portfolio of high-quality debt securities" does not include – or exclude – any class of debt instruments from its embrace.[11]  Standing alone, no investor reading that phrase could be led – or *mis*led – into

---

[11] In fact, "diversified," as explained in the SAI, has a very specific meaning in the context of the Investment Company Act.  *See* SAI at 3.  The following requirements must be met to be "diversified": "at least 75% of the value of . . . total assets is represented by cash and cash items

concluding anything about the specific securities that would make up the Fund's portfolio (other than the manager's opinion that they were "high-quality").  But the full text of the Prospectuses completed the picture.  The introductory statement of the Yield Plus Fund's investment objective – from which the plaintiffs have lifted the single phrase they highlight – states:

> The  nonfundamental investment objective is to seek <u>high current income and liquidity</u> by investing primarily in a <u>diversified portfolio of high-quality debt securities</u> and by maintaining a portfolio duration of one year or less.
>
> The Fund attempts to meet its objective by investing primarily in high-quality dollar-denominated, investment grade debt instruments, such as <u>mortgage related securities</u>, corporate notes, variable and floating rate notes and <u>asset-backed securities</u>.  The Fund may also invest in <u>derivative securities, including . . . futures, options, and other structured securities</u>.  Unlike a money market fund, the price of the Yield Plus Fund will fluctuate because the fund may invest in securities with higher levels of risk and different maturities.  The Fund will actively trade to benefit from short-term yield disparities among different issues of fixed-income securities, or otherwise to increase income.

Prospectus at 4 (emphases added).

In short, the full text of the documents left no investor guessing about the meaning of "a diversified portfolio of high-quality debt securities."   On the very same page on which the challenged excerpt appears, the Prospectuses listed the specific types of instruments that would comprise that portfolio – "investment grade debt instruments, such as mortgage related securities, corporate notes, variable and floating rate notes and asset-backed securities," as well as various "derivative securities."  *Id.*

---

(including receivables), Government securities, securities of other investment companies, and other securities of any single issuer limited to 5% or less of each of the Fund's total assets, and to not more than 10% of the outstanding voting securities of such issuer."  *Id.* (citing Investment Company Act, 15 U.S.C. § 80a-5(b)(1) (2007)).  Plaintiffs do not allege, nor could they, that the Fund was not "diversified" under this standard.

The pleading's claim that the Prospectuses' "descriptions" tacitly excluded mortgage-related assets is thus empty.  The plaintiffs nowhere contend that the Yield Plus Fund did *not* invest in the described securities, or that the Fund invested in *other* securities that the Prospectuses did not describe.  Nor could they.  In addition to the general descriptions of the classes of debt securities in which the Fund would invest, the Fund's Annual Reports detailed the portfolio's specific holdings, including the percentage of the Fund's investments in asset-backed and mortgage-backed securities, and itemized each individual security within those categories that the Fund held.  *See, e.g.*, 2006 Annual Report at 9-12.  Stated differently, the Prospectuses and Annual Reports told investors precisely what classes of debt instruments and precisely what specific securities the Fund owned to execute on its objective of "high current income" through a strategy of investing primarily in a "diversified portfolio of high-quality debt securities."  The full disclosure could not have *mis*led investors in the *wrong* direction about the prospect that the Fund would invest in mortgage-related assets.  To the contrary, it "led" them to exactly what was in the Fund.  The pleading simply does not make out a case of misrepresentation.  It alleges the "descriptions" were "inaccurate" because the Fund was "heavily invested" in "risky" mortgage-related securities, and it proclaims that "many" of the Fund's holdings "had declined."[12]  But the

---

[12] In one throwaway sentence, the plaintiffs also contend that the Yield Plus Fund's intent to "maintain a portfolio duration of one year or less" was misleading because the Fund was "heavily" comprised of securities with a duration of one year or more.  Yu Compl. ¶ 60.  Self-evidently, the plaintiffs confuse "duration" with "maturity."  The "maturity" of a debt security is the date upon which all principal must be repaid.  A debt security's "duration" is a measurement of its price's sensitivity to interest rate changes.  *See* Prospectus at 49; s*ee also* THE HANDBOOK OF FIXED INCOME SECURITIES 197 (Frank J. Fabozzi ed., 7th ed. 2005), Ex. 2 to Memorandum in Support.  As the Fund's periodic reports' itemization of every security in the Fund showed, many of the portfolio's securities had long maturities.  But the vast majority of these were adjustable rate instruments with extremely short durations.  As of August 31, 2005, for example, over 95% of the instruments in the Fund's portfolio were adjustable rate debt securities.  *See* Skinner Declaration, ¶ 6, Ex. E (2005 Annual Report covering both Funds, dated August 31, 2005) (the "2005 Annual Report") at 8-10, 53.  According to the same report, the Yield Plus Fund's floating

phrase "diversified portfolio of high-quality debt securities" does not express – or even comment upon – either concept.  The plaintiffs' attempt to attach a meaning to this phrase of "no risky mortgage securities" or "no risk of declining values" is simply inconsistent with the phrase's text.  And it is contradicted by the balance of the document.  The description is neither a promise of what the Fund will exclude, nor a guarantee against loss.

   *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998) is both analogous and instructive.  There, the plaintiffs complained that a fund's name and description of its investment objective was misleading because the defendants did not alert investors to the risk of significant exposure to Mexican and other Latin American securities, as well as to "risky mortgage-backed derivatives."  *See Hunt*, 159 F.3d at 727.  The court upheld dismissal of the complaint.  It held that the fund's name was consistent with its investment objective, and could not mislead investors into thinking that the fund would *not* invest in Mexican instruments and other Latin American instruments.  Likewise, the lower court earlier held that the fund's description of its investment objective "[a]nnounce[d] the goal . . . rather than a promise to investors."  *In re Alliance N. Am. Gov't Income Trust Inc. Sec. Litig.*, No. 95 Civ. 0330(LMM), 1996 U.S. Dist. LEXIS 14209, *12 (S.D.N.Y. Sept. 26, 1996), *leave to amend denied*, 1997 U.S. Dist LEXIS 10344 (S.D.N.Y. July 15, 1997) (citing *In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326, 338 (S.D.N.Y. 1996) (finding the fund's description and investment objective not misleading)).  Moreover, since the description of the investment objective was accompanied by express disclosures in annual and semi-annual reports that itemized the specific securities in the fund's portfolio, a "reasonable investor could not have

---

rate securities "have yields that are reset either monthly or quarterly at a spread over LIBOR, helping to keep the Fund's duration short." *Id.* at 6.  As a result, the Fund's average duration for this period was well below a year.

been misled as to the Fund's intention to invest in Mexican . . . securities and the amounts that could be so invested." *In re Alliance*, 1996 U.S. Dist. LEXIS 14209, at *16. *Hunt* affirmed the district court's dismissal decision in relevant part. 159 F.3d at 732 (granting leave to replead as to an unrelated disclosure claim).

> **2.      *The Intermediate Fund's Disclosed Objective To Match Or Exceed The Return Of The Lehman Brothers Intermediate Government/Credit Index Was Not Misleading***

The *Plumbers* complaint alleges that the "description" of the Intermediate Fund's objective – "to match or exceed the return of the Lehman Brothers® Intermediate Government/Credit Index" – was misleading because this benchmark was a "stable index" while the Fund was "much riskier." Plumbers Compl. ¶ 60. But that simply confuses the goal of an actively managed portfolio with its measuring yardstick. The allegation rests on the faulty premise that the Fund would be structured with the same securities that comprised the index. But by definition, it would not. The Prospectuses described the Fund's objective to *outperform* the benchmark through active management, and described the specific securities, instruments and "issue and sector" selection it would use in the attempt:

> The fundamental investment objective is to seek a <u>high level of current income while preserving principal by investing primarily in a diversified portfolio of debt securities</u> with a dollar-weighted average maturity between three and ten years.
>
> In pursuing this goal, the Fund under normal market conditions invests at least 80% of its total assets in debt instruments. Shareholders will be notified 60 days prior to changing the non-fundamental 80% investment policy. . . .  In addition, <u>Fund investments will primarily be in debt instruments rated investment grade or better.</u>  The Fund may also invest in <u>derivative securities</u>, including . . . floors and collars and other structured securities; <u>mortgage related securities</u>; and repurchase agreements.  <u>The Fund may actively trade portfolio securities and typically has a portfolio turnover rate in excess of 100% and is therefore subject to portfolio turnover and transaction costs.</u> . . .

> The Fund <u>seeks to match or exceed the return of the Lehman Brothers®</u> <u>Intermediate Government/Credit (LBIGC) Index</u> and to manage the Fund's duration to correspond to the LBIGC Index's duration <u>while adding value through issue and sector selection</u>. The Fund will <u>actively trade</u> to benefit from short-term yield disparities among different issues of fixed-income securities, or otherwise to increase income to the Fund.

Prospectus at 5 (emphases added).

By identifying the LBIGC Index as a performance benchmark against which to measure results, the Prospectuses did not lead investors in any direction about the degree of risk the Fund would undertake, the relative "stability" of the Fund compared to that benchmark, or the prospect that objectives would be achieved. To the contrary, pointing to the LBIGC Index made no representation at all; it only put a stake in the ground. By establishing a yardstick, the Prospectuses did not *lead* investors in *any* direction about stability or risk; and they consequently did not *mis*lead investors in the *wrong* direction about those subjects.

Indeed, the plaintiffs' logic is baffling. On their theory, *no* mutual fund could describe an objective of meeting or beating an index without misleading investors into thinking that the fund would track the structure of the reference point. Do equity funds mislead by comparing themselves to the S&P 500? And if they set "beating the market" by reference to such a benchmark as a goal, do they inevitably mislead? At bottom, that is the plaintiffs' theory. And the answer is obviously no. *See Hunt*, 159 F.3d at 730 (stating that "[n]o reasonable investor" could have viewed mutual fund's comparison to benchmark index "as an exhaustive description of the Fund's risks" where fund disclosed difference in credit quality and where fund "purported only to compare the Fund's returns to those of the Lehman Brothers indexes") (emphasis omitted).

**B.     The Funds Did Not Omit Or Misrepresent Their "Exposure" To Mortgage-Related Securities**

The plaintiffs allege that both Funds misrepresented their exposure to "risky" mortgage-related securities.  *See* Yu Compl. ¶¶ 67-72; Plumbers Compl. ¶¶ 65-70.  Once again, however, the plaintiffs paint an incomplete picture of the Funds' disclosures by selectively quoting from the Registration Statements and omitting relevant disclosures.  The Registration Statements as a whole disclosed both the Funds' exposure to mortgage-related securities and the attendant risks of these types of investments in a manner that could not mislead investors.

The Funds' Prospectuses and SAI disclosed in detail the Funds' strategy to invest in asset-backed and mortgage-backed securities, as well as the accompanying risks for such investments.  Investors were informed in the Prospectuses' opening descriptions that the Funds intended to meet their investment objectives by investing in mortgage-related securities and asset-backed securities, and that asset-backed and mortgage-backed securities were considered principal to the achievement of the Funds' investment objectives.    Prospectus at 4-5.  Nevertheless, investors were warned that "if any required payments of principal and interest are not made with respect to the underlying loans [of an asset-backed security], the Fund may experience loss or delay in receiving payment and a decrease in the value of the security," *id.* at 43, and that mortgage-backed securities were vulnerable to "significantly greater price and yield volatility than is the case with traditional fixed-income securities," *id.* at 18.  Also, investors were cautioned that "[d]efaults on the underlying assets may impair the value of an asset-backed security," *id.* at 15, the "value of asset-backed securities is affected by changes in the market's perception of the asset backing the security," SAI at 3, and that "the market-value of mortgage-related securities depends on, among other things . . . the payment history of the underlying borrowers," *id.* at 4.  Further, investors were informed that, because the Funds invested

significant portions of their assets in particular types of securities, they were "subject to greater risk of loss as a result of adverse economic, business or other developments than if [their] investments were diversified across different industry sectors" and therefore, "[s]ecurities or issuers held by [the Funds] may lack sufficient market liquidity to enable [the Funds] to sell the securities at an advantageous time or without a substantial drop in price."  Prospectus at 19. These disclosures adequately informed investors that the Funds would invest in mortgage-related securities and of the attendant risks of these types of investments.

The plaintiffs flatly ignore these warnings.  Instead, they claim confusion from the Prospectuses' descriptions of "asset-backed securities" and "mortgage-backed securities," and suggest that the definitions misleadingly failed to reveal that the "asset-backed" category included some "mortgage-backed" instruments, including "sub-prime" related securities.  *See, e.g.*, Yu Compl. ¶ 70; Plumbers Compl. ¶ 68.  The plaintiffs are again incorrect.  Securities backed by home equity loans and other similar mortgage-related assets fit squarely within the Prospectuses' definition of "asset-backed securities"  In clear language, the Prospectuses defined "asset-backed securities" to include "securities whose principal and interest payments are supported or collateralized by pools of assets."  Prospectus at 43.  "Mortgage-backed securities," in contrast, was a specifically defined category that did *not* include all categories of securities that are backed by mortgage-related pools, but limited the assets that served as collateral to a defined set that included "first deeds of trust or other similar security instruments" of certain defined types of properties.  *See id.* at 48.

Definitions aside, the plaintiffs allege that the groupings of securities in the Annual Reports' schedules of investments misrepresented the Funds' "true exposure to risky mortgage-related securities."  Yu Compl. ¶ 68; Plumbers Compl. ¶ 65.  But how so?  The complaints do

not say.  The Annual Reports' schedules itemized the portfolios' specific securities in category headings that made it obvious that mortgage-related securities were held within multiple categories, including asset-backed securities, mortgage-backed securities and international debt. For example, the securities listed under the "asset-backed securities" heading in the Yield Plus Fund's 2006 Annual Report included the following descriptions: "Ameriquest Mortgage Securities, Inc.," "Asset Backed Securities Corp. Home Equity," "Indymac Residential Asset Backed Trust," "Morgan Stanley Home Equity Loans" and "Centex Home Equity," while the securities listed under the "international debt"[13] heading included several securities issued by "Granite Mortgages PLC."  2006 Annual Report at 9-10.[14]

Contrary to plaintiffs allegations, the Funds' exposure to mortgage-related debt instruments was readily apparent.  *See In re Alliance*, 1996 U.S. Dist. LEXIS 14209, at *15 (holding that disclosure of actual investments in certain asset classes could not mislead investors about risk exposure to those classes).

### C.  The Complaints Do Not State Actionable Claims That The Funds Misrepresented The "Value" Of Portfolio Securities

The plaintiffs' last substantive disclosure claim is that the Prospectuses reported "inflated" values for "risky mortgage related securities," because of the failure to "write-down" these assets.  Yu Compl. ¶ 63;  Plumbers Compl. ¶ 61.  But beyond that bald allegation, the pleadings supply no basis for the charge.  The pleadings assert that portfolio securities were mispriced, but do not say how.  They do not say what price should have been adopted or when.

---

[13] The plaintiffs' assertion that the Annual Reports were misleading because they provided an additional level of granularity by breaking out international debt securities into a separate category is upside down.  The plaintiffs' complaint in this respect is that the reports provided *more* disclosure, not less.  But how that misleads investors the pleadings do not say.

[14]  The schedules of investments for the Intermediate Fund were equally explicit.  2006 Annual Report at 34-44.

They allege that the Funds were obliged to use "fair value" pricing when actual market prices were not available, but did not.  But how the Funds failed to "fair value" price securities is omitted.  In short, the complaints accuse the Prospectuses of false disclosure without identifying the truth.

Such *ipse dixit* is not an adequate basis for a securities claim.  *See Parisi v. Coca-Cola Bottling Co. of N.Y.*, 995 F. Supp. 298, 300-01 (E.D.N.Y. 1998) ("Where the allegations are so baldly conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains, they are meaningless as a practical matter and legally insufficient to state a claim.") (citing *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)).

### 1.   The Plaintiffs' Conclusory Allegations Of Overstated Valuations Do Not Plead Actionable Falsity

Pursuant to Rule 22c-1(b) promulgated under the Investment Company Act, the Funds are obliged to calculate net asset value by marking portfolio assets to market "no less frequently than once daily."[15]  17 C.F.R. § 270.22c-1(b).  The complaints variously allege that the Funds "failed to properly value the NAV,"  Yu Compl. ¶ 35; Plumbers Compl. ¶ 35,[16] "fail[ed] to properly value [their] investments in mortgage-related securities," Yu Compl. ¶ 59; Plumbers Compl. ¶ 59, "did not use the security's fair value,"  Yu Compl. ¶ 65; Plumbers Compl. ¶ 63, and were "unable to or otherwise failed to properly value the securities as represented," Yu Compl. ¶ 65; Plumbers Compl. ¶ 63.  But plaintiffs plead no facts to support their claim of falsity.

That omission is fatal under the fundamental prerequisite for maintaining any civil complaint.  The bald allegation of falsity – while omitting to say how or why the pricing was

---

[15] In fact, the Yield Plus Fund calculated its share price twice per day.  Prospectus at 59.

[16] The share price of a mutual fund is a function of the net asset value ("NAV") of the fund, which is based on a statutory formula.  The fund's NAV is calculated by dividing all the assets of the fund, minus liabilities and fees, by the number of shares outstanding.  Prospectus at 59.

wrong – means that neither the Court nor the defendants can comprehend the claim.  What is required is "enough fact to raise a reasonable expectation that discovery will reveal evidence" of the alleged misrepresentation.   *Twombly*, 550 U.S. 554, 127 S. Ct. at 1965.  But the naked claim does not begin to hint that discovery would yield anything of substance.  *See ATSI*, 493 F.3d at 98 ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'") (quoting *Twombly*, 550 U.S. 554, 127 S. Ct. at 1965) (2007); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (holding that plaintiff's Securities Act claims failed to meet Rule 8 pleading standard where plaintiff failed to "plead facts sufficient to render the claims 'plausible'") (citing *Twombly*, 550 U.S. 554, 127 S. Ct. at 1965)).

The Funds' pricing methodology, including their Fair Value Procedures, was fully disclosed in the Registration Statements, *see* Skinner Declaration, ¶ 7, Ex. F (2004 Combined Prospectus covering both Funds) (the " 2004 Prospectus") at 54, and the plaintiffs nowhere assert that defendants did not fully comply with the disclosed procedures.[17]  Although the complaints

---

[17] The disclosure in the 2004 Prospectus reads as follows:

> If market quotations are not readily available for a security or if subsequent events suggest that a market quotation is not reliable, the SSgA Funds will use the security's fair value, as determined in accordance with Fair Value Procedures.  This generally means that equity securities and fixed income securities listed and traded principally on any national securities exchange are valued on the basis of the last sale price or, lacking any sales, at the closing bid price, on the primary exchanger on which the security is traded.  The effect of fair value pricing is that securities may not be priced on the basis of quotations from the primary market in which they are traded, but rather may be priced by another method that the Funds' Board of Trustees believes reflects fair value.  There can be no assurance that the Funds' net asset value fairly reflects security values as of the time of pricing when using the Fair Value Procedures to price the funds' securities.  Events or circumstances affecting the values of fund securities that occur between the closing of the principal markets on which they trade and the time the net asset value of fund shares is determined may be reflected in the Trust's calculation of net asset values for each applicable fund when the Trust deems

refer to certain data and news reports on foreclosures in the subprime market, the plaintiffs fail to plead anything more than the conclusory allegation that defendants did not, in fact, take these and other data into account when valuing the Funds' securities pursuant to the Fair Value Procedures.[18]   *See In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1181-82 (N.D. Cal. 2004) (rejecting allegation that Fund did not value restricted securities at "fair value," but instead valued them "at cost" despite factors that allegedly supported a change in valuation, because Fund disclosed that it deemed "fair value" to be "at cost").   The complaints provide no factual support for the allegation that defendants did not value the securities consistently with the methodology described in the Prospectuses.

The plaintiffs instead assert that assets *must have been* misvalued because the Funds "belatedly" wrote down the value of certain securities at a later point in time.   Yu Compl. ¶ 76; Plumbers Compl. ¶ 74.   The plaintiffs imply that the subsequent decision to write down the value of certain securities somehow means that defendants should have known earlier that the securities were overpriced and thus that values were "inaccurate."   Yu Compl. ¶ 65; Plumbers Compl. ¶ 63.   But that applies 20-20 hindsight.   Although the complaint baldly charges that

---

that the particular event or circumstance would materially affect such fund's net asset value.

From 2005 onward, the Prospectuses contained still more extensive disclosures, such as examples of when the Funds may use Fair Value Procedures, as well as the following caveat:  "A security valued on the basis of an evaluation of its fair value may be valued at a price higher or lower than available market quotations.  A security's valuation may differ depending on the method used and the factors considered in determining value pursuant to the Fair Value Procedures."  *See* Skinner Declaration, ¶ 8, Ex. G (2005 Combined Prospectus covering both Funds) (the " 2005 Prospectus") at 62.

[18] *See, e.g.*, Yu Compl. ¶ 65; Plumbers Compl. ¶ 63 ("[T]he Fund did not use the 'security's fair value' but instead was unable to or otherwise failed to properly value the securities as represented and reported inflated values for mortgage-related investments, which failed to take into account prevailing economic conditions.").

prices of securities were "inaccurate," and were written down "belatedly," it does not say – and it could not – that any price attributed to any portfolio security at any time within the putative class periods could not be sold at that price at that time. The plaintiffs' allegations point to "indicators" of trouble in the mortgage markets, including increasing delinquencies and higher interest rates, but they say nothing to suggest that investors bought, sold and traded mortgage-related securities at prices different than the values at which the Funds recorded them. The plaintiffs' reference to "prevailing economic conditions" is simply beside the point.

The pleadings omit to state what fact was known and overlooked throughout a multi-year period that would inexorably lead to different pricing decisions at any specific point in time. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 447 (S.D.N.Y. 2005) ("The truth of a statement made in the prospectus is adjudged by the facts as they existed when the registration statement became effective."); *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004) ("That defendants later decided to revise the amount of loan loss reserves that it deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time the registration statement and prospectus became effective."); *see also Coronel*, 2009 WL 174656, at *14 (noting approvingly the Eighth Circuit's ruling that the plaintiffs' reliance on disclosures made after the registration statement was issued as proof that the registration statement was false at the time it was made was insufficient to state a claim under Rule 8); *cf. Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 165 (2d Cir. 2000) ("The determination of materiality is to be made upon all the facts as of the time of the transaction and not upon a 20-20 hindsight view long after the event.") (citing *Spielman v. Gen. Host Corp.*, 402 F. Supp. 190, 194 (S.D.N.Y. 1975), *aff'd per curiam*, 538 F.2d 39 (2d Cir. 1976)).

2.   ***The Prospectuses' Descriptions Of The Funds' Pricing Methodology Are Protected By The Bespeaks Caution Doctrine***

As the case law recognizes, materiality is a relative concept; a court must appraise an alleged misstatement or omission in context. *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). Under the "bespeaks caution" doctrine and the safe harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 77z-2(c), alleged misstatements or omissions are "immaterial as a matter of law" where reasonable investors could not "consider them important in light of adequate cautionary language set out in the same offering." *Rombach*, 355 F.3d at 173 (quoting *Halperin*, 295 F.3d at 357). The "bespeaks caution" doctrine will operate to preclude liability where the presence of cautionary language "identif[ies] the allegedly undisclosed risk" and when the warning cannot be read by an investor to think that "the risk . . . did not actually exist." *Halperin*, 295 F.3d at 359 (relying on *Olkey*, 98 F.3d at 5).[19]

The plaintiffs allege that each of the Funds "materially overstated the value of its portfolio," Yu Compl. ¶ 59; Plumbers Compl. ¶ 59, did not "properly value the securities" and "reported inflated values for mortgage-related investments," Yu Compl. ¶ 65; Plumbers Compl. ¶ 63. However, the Prospectuses specifically and explicitly warned that price variances may occur when using Fair Value Procedures:

> The effect of fair value pricing is that securities may not be priced on the basis of quotations from the primary market in which they are traded, but rather may be priced by another method that the Funds' Board of Trustees believes reflects fair value. A security valued on the basis of an evaluation of its fair value may be valued at a price higher or lower than available market quotations. A security's valuation may differ depending on the method used and the factors considered in determining value pursuant to

---

[19] Similarly, the PSLRA created a "safe harbor" in the Act for forward-looking statements that are either immaterial, "limited by meaningful cautionary statements," or made without actual knowledge that the statement was false or misleading. 15 U.S.C. § 77z-2(c).

> the Fair Value Procedures. There can be no assurance that the Funds' net asset value fairly reflects security values as of the time of pricing when using the Fair Value Procedures to price the Funds' securities.

Prospectus at 59. This warning language easily meets the Second Circuit's test for immateriality under the bespeaks caution doctrine: it highlights the specific risk that valuations done through Fair Value Procedures might fail to accurately reflect security values at the time of pricing, and does so in a manner that no reader could think was equivocal. *See Lin*, 574 F. Supp. 2d at 420 (dismissing claims under bespeaks caution doctrine when defendants' disclosed that "[i]f the behavior of price movements of individual securities diverges substantially from what their historical behavior would predict, we might incur trading losses"). As a result, the alleged misstatements in the Prospectuses' disclosures concerning Fair Value Procedures are immaterial as a matter of law.

### 3. The Plaintiffs' Conclusory Allegations Of Overstated Valuations Are Not Pled With The Requisite Particularity

The particularity requirement of Rule 9(b) applies to claims brought under Sections 11 and 12 when those claims are "grounded in fraud." *See Rombach*, 355 F.3d at 170 (holding that the Rule 9(b) heightened pleading standard applied to securities claims under Sections 11 and 12(a)(2) "when premised on averments of fraud"). Claims that are not "styled or denominated" as fraud, and even those that specifically disclaim fraud, will nonetheless be held to Rule 9(b)'s heightened pleading requirements when based on allegations of fraud. *Id.* at 171-72; *see also In re AIG Advisor Group*, No. 06 CV 1625(JG), 2007 WL 1213395, at *13 (E.D.N.Y. Apr. 25, 2007) ("The plaintiffs may not escape the particularity requirements of Rule 9(b) and the PLSRA [sic] merely by including template language disclaiming fraud."). When applicable, Rule 9(b) requires that a plaintiff specify which statements were fraudulent, identify who made the statements, specify when and where the statements were made and explain why the statements

were fraudulent.  *See ATSI*, 493 F.3d at 99.  Conclusory allegations or those with no factual

support fail to satisfy the Rule 9(b) pleading standard.  *Id.* (citing *Luce v. Edelstein*, 802 F.2d 49,

54 (2d Cir. 1986)).

The complaints allege that defendants did not use the "security's fair value, as determined

in accordance with Fair Value Procedures" and "failed to properly value the securities as

represented" in the Registration Statements.   Yu Compl. ¶ 65; Plumbers Compl. ¶ 63.   By

alleging that defendants did not value securities "as represented," the plaintiffs essentially allege

that the securities were priced by a method that the defendants *did not* believe reflected the

securities' fair values.   Such a claim alleges knowing and intentional misconduct, not ordinary

negligence; therefore, the allegations sound in fraud.  *See Rombach*, 355 F.3d at 172 (noting that

the "wording and imputations" of the plaintiffs' Section 11 claims were "classically associated

with fraud"); *Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 7 Civ. 0976(LAP), 2008 WL

4449280, at *11 (S.D.N.Y. Sept. 30, 2008) (holding that plaintiffs' allegations must be pled with

particularity because the complaint asserted that defendants had actual knowledge of the

degradation of satellite network but it deliberately withheld that information from investors); *In

re CIT Group*, 349 F. Supp. 2d at 690 n.4 (noting that plaintiffs' allegations that defendants

misrepresented in prospectus that they believed loan loss reserves were adequate

"unquestionably sounds in fraud and therefore implicates Rule 9(b)").   At a minimum, the

plaintiffs' allegations – that defendants consistently and repeatedly ignored available evidence

suggesting that the Funds were overvaluing mortgage-related securities throughout the three-year

putative class periods – suggest a deliberate indifference or reckless misrepresentation of the

facts in the Registration Statements.  *See Ladmen Partners*, 2008 WL 4449280, at *12-13

(holding that allegations that underwriter defendants "ignored specific and readily apparent red

flags indicating that the degradation and deterioration of Globalstar satellites was far more significant than that which was disclosed" sounded in fraud because they "suggest[ed] that [defendants] deliberately turned a blind eye to known deficiencies").  Because the plaintiffs appear to assert allegations of intentional or reckless misrepresentation, their claims sound in fraud and should be held to the heightened pleading standard under Rule 9(b).

Applying the Rule 9(b) standard, the plaintiffs' conclusory and factually unsupported allegations of misvaluations[20] are not pled with the requisite particularity.  *See ATSI*, 493 F.3d at 99 ("Allegations that are conclusory or unsupported by factual assertions are insufficient."); *see also In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 586 (S.D.N.Y. 2006) (noting that "bald allegations" are "far too conclusory" to satisfy the requirements of Rule 9). The plaintiffs fail to identify adequately the specific statements that were allegedly fraudulent and do not even attempt to explain why or how the statements were fraudulent – such as which values were overstated, how, when and by how much.  *See ATSI*, 493 F.3d at 99.  Rather, the only "fact" put forward by the plaintiffs is that "based upon facts existing at that time concerning problems with the real estate and mortgage industries, the Fund materially overstated the value of its portfolio and NAV by failing to properly value its investments in mortgage-related securities and by failing to write-down those investments in a timely fashion."  Yu Compl. ¶ 59; Plumbers Compl. ¶ 59.  Because the plaintiffs do not support these allegations with any factual basis whatsoever, they fail to state a claim under the Rule 9(b) standard.  *See ATSI*, 493 F.3d at 99.

---

[20] *See, e.g.*, Yu Compl. ¶ 35; Plumbers Compl. ¶ 35 ("The NAVs that were paid by each Class Member were inflated because the Defendants failed to properly value the NAV and failed to timely write-down the troubled mortgage-related assets in the Fund's portfolio.").

**D.**  **The Certifications Signed By Defendants Ross And Swanson And Attached To The Funds' Periodic Reports Did Not Contain Any Untrue Statements Of Material Fact**

The plaintiffs have alleged without any specific facts in support that the certifications signed by defendants Ross and Swanson, which were attached to the Funds' periodic reports, contained untrue statements of material fact.  *See* Yu Compl. ¶ 75; Plumbers Compl. ¶ 73.  The Funds' periodic reports contained performance information and holdings information, and the certifications provided by defendants Ross and Swanson primarily related to appropriate accounting controls.  As discussed in detail above, the plaintiffs have insufficiently pled that defendants reported inflated NAVs for the Funds or inflated values for the Funds' mortgage-related securities.  Also as discussed above, the plaintiffs have failed to state a claim for any material misrepresentations of the Funds' investment objectives or holdings, which were disclosed in great detail in the Funds' periodic reports.  Thus, there are simply no facts to support the allegation that the certifications made by defendants Ross and Swanson contained untrue statements of material fact.  Accordingly, the plaintiffs have failed to state any claim with respect to these certifications.

**II.**  **THE PLAINTIFFS' SECTION 11 AND 12(A)(2) CLAIMS ALSO FAIL BECAUSE THEIR ALLEGED LOSSES ARE NOT CAUSALLY CONNECTED TO THE ALLEGED MISSTATEMENTS OR OMISSIONS**

Lack of loss causation is an affirmative defense to claims under Section 11 and 12(a)(2). 15 U.S.C. §§ 77k(e), 77*l*(b).  If it is apparent from the face of the complaint that the alleged loss is not causally connected to the alleged misstatements or omissions, the complaint may be dismissed.  *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003) ("Where it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses, dismissal of the complaint pursuant to Fed. R. Civ. P. 12(b)(6) is proper.") (citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) ("An

affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint.")).

To determine if loss causation exists, the court must look at whether the purported misstatements or omissions "concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F. 3d 161, 173 (2d Cir. 2005). The misstatements or omissions themselves must cause the plaintiffs' loss, not some other "tangle of factors," including "changed economic circumstances." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). Here, the plaintiffs' alleged losses were not brought about by any revelation that corrected any false statement. Self-evidently, the Funds' losses were realized when "changed economic circumstances" affected the value of the securities in the Funds' portfolios.

There is no causal link between any alleged misrepresentations in the Funds' Registration Statements and a drop in the Funds' share prices, nor could there be. The price of mutual fund shares is not determined by open-market securities trading where misstatements or omissions might have an effect on the share price of a security. Rather, the share prices are a function of a fund's NAV, which is calculated based on a statutory formula. *In re Salomon Smith Barney*, 441 F. Supp. 2d at 590 (noting that a mutual fund's share price is a function of NAV, "minus liabilities such as fees") (quoting *In re Morgan Stanley*, 2006 WL 1008138, at *9)). Because mutual fund shares derive their price exclusively from the value of the underlying securities, any misstatements about the Fund itself can have no effect on the NAV. *Clark v. Nevis Capital Mgmt., LLC*, No. 06 CV 1625(JG), 2005 WL 488641, at *18 (S.D.N.Y. Mar. 2, 2005) (noting that the price of "shares in a mutual fund . . . [is] unaffected by alleged misrepresentations and

omissions concerning the fund itself") (citing *Young v. Nationwide Life Ins. Co.*, 183 F.R.D. 502, 510 (S.D. Tex. 1998) ("[T]he share price of a mutual fund is not affected by alleged misrepresentations or omissions.  The share price of a mutual fund is determined by the value of all the underlying securities it holds at a given time, and the fund price fluctuates with the price of those underlying securities.")); *see also In re Van Wagoner Funds*, 382 F. Supp. 2d at 1188 (noting that "the share price of a mutual fund is not affected by alleged misrepresentations or omissions; the share price of a mutual fund is determined by the value of all underlying securities it holds at a given time").  Accordingly, here the Funds' NAVs declined only because the Funds' securities declined in value, not because of the revelation of any alleged misstatements or omissions in the Registration Statements.

Likewise, even if the plaintiffs could provide factual support for their conclusory allegations that defendants inflated the Funds' NAVs, this alone could not establish loss causation.  In *Dura*, the Supreme Court held that a fraudulently inflated purchase price does not alone constitute loss causation.  544 U.S. at 347.  Instead, the loss must be attributable to misstatements that bring about a decline in the value of the security once the truth is revealed. *Id.* (rejecting plaintiff's claim of loss causation because of the "complaint's failure to claim that Dura's share price fell significantly after the truth became known"); *id.* at 344 (observing that the Restatement of Torts asserts that one who "'misrepresents the financial condition of a corporation in order to sell its stock' becomes liable to a relying purchaser 'for the loss' the purchaser sustains 'when the facts . . . become generally known' and 'as a result' share value 'depreciate[s]'") (quoting RESTATEMENT (SECOND) OF TORTS § 548A cmt b (1977)) (emphasis added); *Lentell*, 396 F.3d at 173 (declaring that misstatements or omissions, in order to constitute loss causation, must "conceal[] something from the market that, when disclosed, negatively

affect[] the value of the security"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 253-55 (S.D.N.Y. 2003) (noting that a complete negative causation defense exists on the face of the complaint where the securities at issue declined in value before a corrective disclosure occurred); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (N.D. Cal. 2008) ("The face of a complaint can provide a complete causation defense where the vast majority of a security's decline cannot be attributed to an alleged corrective disclosure.").

The plaintiffs do not, and cannot, allege that such a corrective disclosure instigated a decline of the Funds' share prices and caused the plaintiffs' alleged losses.  Marking portfolio assets to market is required as a matter of law.  Price declines over time that reflect execution of this obligation does nothing to reveal – much less correct – any alleged misstatement or omission.  Each day, the value of the securities in the Funds' portfolios were "marked-to-market."  Certain securities decreased in value over time, obliging the defendants to write down those assets in the portfolios.  The decline in value of those assets, however, was not caused by any misleading disclosures made in the Registration Statements.  Rather, it was caused by "changed economic circumstances" – specifically, the unprecedented decline in the bond market. The plaintiffs therefore cannot connect any alleged misstatement or omission in the Funds' Registration Statements to the decline in the Funds' NAVs.  Because the lack of loss causation is apparent on the face of the complaints, the plaintiffs' Section 11 and 12(a)(2) claims should be dismissed.

## III.   THE PLAINTIFFS' SECTION 12(A)(2) CLAIMS MUST BE DISMISSED AGAINST STATE STREET CORPORATION, SSGA, AND INDIVIDUAL DEFENDANTS LEAHY, ROSS AND SWANSON BECAUSE THESE PARTIES ARE NOT "SELLERS" OF THE FUNDS

The plaintiffs may only assert a Section 12(a)(2) claim against the "seller" of a security. *See* 15 U.S.C. § 77*l*(a)(2).  A "seller" is the "owner who passed title" or "any person who

successfully solicits the purchase [of a security], motivated at least in part by a desire to serve his

own financial interests or those of the security holder." *Pinter v. Dahl*, 486 U.S. 622, 647

(1988). State Street Corporation, SSgA and individual defendants Leahy, Ross and Swanson do

not meet these tests.[21]

State Street, SSgA and individual defendants Leahy, Ross and Swanson never owned or

passed title to the securities in the Funds, nor do the plaintiffs allege that they did. The plaintiffs

state the legal conclusion that defendants were "sellers and offerors and/or solicitors of

purchasers of the shares" of the Funds without alleging any facts in support of that conclusion.

The Court should not accept such legal conclusions as sufficient under Section 12(a)(2). *See,

e.g.*, *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996) (rejecting use of

conclusory "solicitation" label as a "legal term of art"). Further, the plaintiffs do not allege that

State Street, SSgA or individual defendants Leahy, Ross and Swanson directly solicited any

buyer, or did anything more than generally participate in the sale of the Funds' shares. Such

general participation is insufficient to confer "seller" status under Section 12. *See, e.g.*,

*Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co.*, 794 F. Supp. 1265, 1283-85

(S.D.N.Y. 1992) (liability does not extend beyond those who "actively solicit offers to buy

securities"); *Mabon, Nugent & Co. v. Borey*, 127 B.R. 727, 734-35 (S.D.N.Y. 1991) (members of

company's board of directors who authorized securities sales but did not solicit sales were

"quintessentially collateral participants" who were not liable under Section 12 because

"substantial participation in causing the sale to take place . . . is insufficient" to cause Section 12

liability) (quoting *Bernstein v. Crazy Eddie, Inc.*, 702 F. Supp. 962, 975 (E.D.N.Y. 1988)); *In re

Gas Reclamation, Inc. Sec. Litig.*, 733 F. Supp. 713, 723-24 (S.D.N.Y. 1990) (no liability where

---

[21] The Independent Trustees of the Funds are likewise not sellers, as demonstrated in a separate
Motion to Dismiss being filed by their counsel.

defendants did not have "direct contact" or personally solicit plaintiffs or other investors); *Sellin v. Rx Plus, Inc.*, 730 F. Supp. 1289, 1292 (S.D.N.Y. 1990) (no Section 12 liability for lawyer who prepared allegedly misleading private placement memorandum but did not solicit sales because "[t]o be held liable under § 12, a person must have been involved in the actual solicitation of sales"); *see also Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1016-17 (2d Cir. 1989) (no Section 12 liability for attorney who was also director and member of executive committee of seller but who did not initiate or negotiate sale, and thus did not "solicit" sale).  Therefore, in addition to the reasons set forth in Points I and II above, the plaintiffs' Section 12(a)(2) claim against State Street Corporation, SSgA and individual defendants Leahy, Ross and Swanson should be dismissed because they are not statutory sellers.

## IV.   THE "CONTROL PERSON" CLAIMS UNDER SECTION 15 MUST BE DISMISSED

### A.   The Plaintiffs Have Not Alleged A Primary Violation

To state a claim for control-person liability under Section 15, the plaintiffs must allege both "(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator."  *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910(GEL), 2005 WL 2990646, at *7 (S.D.N.Y. Nov. 7, 2005).  For the reasons set forth in Points I-III above, the plaintiffs have failed to state a primary violation of Sections 11 or 12(a)(2) by any defendant, and thus the Court must dismiss the plaintiffs' Section 15 claim as well.  *See id.*

### B.   The Plaintiffs Fail To Allege That Individual Defendants Leahy, Ross and Swanson Exercised Actual Control Over Any Allegedly Controlled Entity

In addition to stating a primary violation, plaintiffs asserting a Section 15 claim must allege facts showing that each purported "control person" exercised a degree of day-to-day control over another defendant sufficient to dictate the other's conduct or operations.  *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2);

*In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003) ("A plaintiff is required to prove actual control, not merely control person status."). Conclusory allegations of control fail to provide "fair notice" under Rule 8 of the Federal Rules of Civil Procedure. *In re Worldcom, Inc. Sec. Litig.*, 02 Civ. 3288(DLC), 03 Civ. 0890, 2004 WL 1097786, at *2-3 (S.D.N.Y. May 18, 2004). The statute contemplates that to be liable under Section 15, the defendant must exercise control with respect to the "acts constituting" the primary "violation." 15 U.S.C. § 78t(a).

The plaintiffs allege that individual defendants Leahy, Ross and Swanson were control persons despite the plaintiffs' own assertion that "various financial organizations" with which the individual defendants have no relation provide "day-to-day management required by the Fund[s]." *See* Yu Compl. ¶ 22; Plumbers Compl. ¶ 22. The plaintiffs rely on the conclusory allegation that each trustee "was a control person of the Fund by virtue of his or her position" and speculate that each "had a series of direct and/or indirect business and/or personal relationships with other trustees," but the plaintiffs fail to allege how any of the individual defendants influenced operations or exercised day-to-day control with respect to the Registration Statements and investment decisions at issue. *See* Yu Compl. ¶ 106; Plumbers Compl. ¶ 102. Therefore, the plaintiffs' Section 15 claim should be dismissed as against the individual defendants Leahy, Ross and Swanson.

## <u>CONCLUSION</u>

For the reasons provided above, the Amended Complaints should be dismissed with prejudice.

Dated:  March 11, 2009                              Respectfully submitted,


                                                    ROPES & GRAY LLP


                                     By    /s/ John D. Donovan, Jr.
                                           John D. Donovan, Jr.
                                           Harvey J. Wolkoff
                                           Robert A. Skinner
                                           One International Place
                                           Boston, Massachusetts 02110
                                           (617) 951-7000
                                           john.donovan@ropesgray.com
                                           harvey.wolkoff@ropesgray.com
                                           robert.skinner@ropesgray.com

                                           *Attorneys for Defendants*
                                           *State Street Corporation, State Street Global*
                                           *Advisors, SSgA Funds, Peter G. Leahy,*
                                           *James Ross and Mark E. Swanson*