**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE STATE STREET BANK AND TRUST CO. FIXED INCOME FUNDS INVESTMENT LITIGATION | Civil Action No. 08-md-1945 |
| NING YU, On Behalf of Himself and All Others Similarly Situated, <br><br>    Plaintiffs, <br><br>    v. <br><br> STATE STREET CORPORATION, et al., <br><br>    Defendants. | Civil Action No. 08-cv-08235-RJH <br> (Relates to 08-md-1945) |
| PLUMBERS AND STEAMFITTERS UNION LOCAL NO. 10 HEALTH & WELFARE, Individually and on Behalf of All Others Similarly Situated, <br><br>    Plaintiffs, <br><br>    v. <br><br> STATE STREET CORPORATION, et al., <br><br>    Defendants. | Civil Action No. 08-cv-07934-RJH <br> (Relates to 07-cv-8488) |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF STATE STREET'S MOTION TO DISMISS CLASS ACTION SECURITIES COMPLAINTS**

11782142.DOC

## **TABLE OF CONTENTS**

1. PLAINTIFFS' ALLEGATIONS THAT DEFENDANTS MISREPRESENTED THE VALUES OF THE FUNDS' PORTFOLIO SECURITIES FAIL AS A MATTER OF LAW ................................................................................................................1

2. THE REGISTRATION STATEMENTS ADEQUATELY DISCLOSED THE FUNDS' EXPOSURE TO MORTGAGE-RELATED SECURITIES AND THE ASSOCIATED RISKS OF THESE INVESTMENTS ...............................................................................4

3. THE PROSPECTUSES' DESCRIPTIONS OF THE FUNDS WERE NOT MISLEADING ...................................................................................................................6

4. PLAINTIFFS CANNOT ESTABLISH LOSS CAUSATION, AS THE ALLEGED LOSSES ARE NOT CAUSALLY CONNECTED TO ANY ALLEGED MISSTATEMENTS ......................................................................................................8

5. THE SIGNATURES ALONE OF DEFENDANTS LEAHY, ROSS AND SWANSON ARE INSUFFICIENT TO SUPPORT PLAINTIFFS' CLAIMS UNDER SECTION 12(A)(2) OR SECTION 15 ...........................................................................................10

CONCLUSION ..............................................................................................................................11

# **TABLE OF AUTHORITIES**

## CASES

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................. 2, 3

*Braka v. Multibanco Comermex, S.A.*, 589 F. Supp. 802 (S.D.N.Y. 1984) ............................... 7

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) .................................................................. 10

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002) ............................................ 3

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998) ..................... 8

*In re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510 WHA, 2009 WL 262456 (N.D. Cal. Feb. 4, 2009) ......................................................................................................................... 9

*In re Exabyte Corp. Sec. Litig.*, 823 F. Supp. 866 (D. Colo. 1993) ........................................... 7

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...................................................................................................................................... 8

*In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 1173 (N.D. Cal. 2004) ..................... 9

*In re Vivendi Universal, S.A. Sec. Litig*, No. 02 Civ. 5571(RJH)(HBP), 2009 WL 920259 (S.D.N.Y. Mar. 31, 2009) ....................................................................................................... 9

*In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003) .................................. 10

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ................................................... 9

*Mabon, Nugent & Co. v. Borey*, 127 B.R. 727 (S.D.N.Y. 1991) ............................................... 10

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008) ........ 7

*Phillips v. Kidder, Peabody & Co.*, 993 F. Supp. 303 (S.D.N.Y. 1996) .................................... 7

**STATUTES**

15 U.S.C. § 80a-2(a)(41) ................................................................................................................2

15 U.S.C. § 77k(e) .........................................................................................................................8

15 U.S.C. § 77*l*(b) .........................................................................................................................8

**OTHER AUTHORITIES**

17 C.F.R. § 270.22c-1(b) ...........................................................................................................1, 2

35 Fed. Reg. 19,986 (Dec. 31, 1970) .............................................................................................2

Defendants State Street Corporation, SSgA Funds, and individual defendants Peter G. Leahy, James Ross and Mark E. Swanson (collectively, "State Street") respectfully submit this memorandum in further support of their motion to dismiss plaintiffs' Amended Class Action Complaints in the *Yu* and *Plumbers* actions.

1.  **Plaintiffs' Allegations That Defendants Misrepresented The Values Of The Funds' Portfolio Securities Fail As A Matter Of Law**

Plaintiffs' claim that "Defendants should have marked down the value of their mortgage-related assets, as well as the resulting [net asset value ("NAV")] of each Fund, long before they began to do so in late 2007," Opp. at 9, confuses "value" and price. Plaintiffs do not identify any portfolio asset that was allegedly over-valued. They point to no individual portfolio security, specify no actual price at which it was held, juxtapose no "correct" price against that measure, or propose when a "correction" should have occurred. Plaintiffs point only to macro-economic trends in the housing and mortgage sectors during 2005-07, which they label "facts demonstrating that the meltdown of the sub-prime mortgage industry and mortgage-related securities began prior to and continued throughout the Class Periods." Opp. at 8-9. From that premise – that the ultimate meltdown started and persisted – plaintiffs make the logical leap that prices of portfolio securities *must* have been "inflated" because their values later fell. Opp. at 7. Worse, they leap to the conclusion that the "inflation" was State Street's doing. But this is a legal and logical non-sequitur.

Plaintiffs' theory is premised on the false assumption that *State Street* – rather than the market – controlled the price of the securities in the portfolios. As a matter of law, State Street was not authorized to value a portfolio security's value without regard to current market prices. Investment Company Act Rule 22c-1(b) always prescribed State Street's obligation: if a market quotation is readily available for a security, State Street must use it; if not, the security must be

priced at "fair value as determined in good faith by the board of directors."  15 U.S.C. § 80a-2(a)(41); 17 C.F.R. § 270.22c-1(b).  According to the SEC, "[a]s a general principle, the current 'fair value' of an issue of securities" should be "the amount which the owner might reasonably expect to receive for them upon their current sale."  *See* SEC Accounting Series Release No. 118, Accounting for Investment Securities by Registered Investment Companies, 35 Fed. Reg. 19,986 (Dec. 31, 1970).  Consequently, plaintiffs' bald allegations that State Street "did not use the Securit[ies'] fair value[s]," Yu Compl. ¶ 65, Plumbers Compl. ¶ 63, have no plausible factual basis absent an allegation that the supposedly "inflated" valuations did not comport with prevailing market prices.  That factual allegation has not been – and cannot be – made.

The Complaints conspicuously omit any reference to prevailing market prices for the Funds' portfolio securities.  And the pleadings do not allege that any of the Funds' securities could not have been sold at the prices attributed to them at any time.  *See* Def. Mem. at 24.  Instead, plaintiffs point to macro-factors as "indicators" that the housing market was troubled – completely untethered from any market pricing – and then state by *ipse dixit* that State Street must not have properly taken these indicators into account.  Opp. at 8-9; Yu Compl. ¶¶ 40-54; Plumbers Compl. ¶¶ 40-54.  But it is of no moment that plaintiffs, with the benefit of hindsight, have catalogued data that they think should have put the *entire market* on notice that certain securities might decline in value.  These allegations still omit to state the critical fact necessary to push the claims over the line from the possible to the plausible:  that the allegedly "inflated" prices at which State Street marked the securities were not, in fact, prices at which the securities were selling in the market.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545-46 (2007).

Moreover, the Prospectuses described in detail how the Funds' securities would be priced – including their procedures for "fair value" pricing in the absence of reliable market pricing –

and plaintiffs make no attempt to explain how the Funds failed to implement these procedures. Here again, the mere fact that State Street marked down the value of certain securities in 2007 under these procedures does not allow a logical inference that the procedures were not being followed previously – much less a plausible claim that the Prospectuses were *misleading* in describing the procedures.  *See Twombly*, 550 U.S. at 555-56.

Finally, the Prospectuses' disclosures regarding the Funds' pricing procedures included specific and clear cautionary language that promised no "accurate" results when fair value pricing procedures were used and are thus protected by the "bespeaks caution" doctrine.  *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).  Plaintiffs argue that the Prospectuses' cautionary language was "wholly boilerplate" because it failed to refer to so-called "valuation risks" that were "already occurring" – *i.e.*, the market trend "indicators" of a troubled housing market.  Opp. at 11.  On their face, however, these "valuation risks" were not risks inherent in the asset valuation process, but risks related to investment in the underlying mortgage-related securities themselves.  Opp. at 11 (listing as an example of a valuation risk "the significant increase in U.S. mortgage default rates that began in 2005").  Such sector-specific investment risks are simply irrelevant to pricing methodology, and their absence from the pricing disclosures fails as a matter of law to render those disclosures misleading.

Simply put, none of plaintiffs' allegations permits an inference that State Street valued the Funds' securities in a way that was inconsistent with then current market prices or with fully disclosed fair value pricing procedures.  That is dispositive of plaintiffs' claims as a matter of law.

## 2. The Registration Statements Adequately Disclosed The Funds' Exposure to Mortgage-Related Securities and the Associated Risks Of These Investments

Plaintiffs do not dispute that the Prospectuses disclosed that the Funds could and did hold mortgage-related securities, or that the Prospectuses and Statements of Additional Information ("SAI") described the risks associated with such holdings. Opp. at 4, 19-20. Instead, plaintiffs insist that the Prospectuses were misleading because they did not disclose the "true extent of [the Funds'] exposure to mortgage-related securities." Opp. at 14. Plaintiffs also complain about the way that mortgage-related securities were grouped within the Funds' holdings disclosures and that the Prospectuses did not discuss housing market trends. Opp. at 15, 18.

Significantly, plaintiffs do not address the Prospectuses' specific disclosures of the risks associated with asset-backed and mortgage-backed securities or explain how these disclosures left shareholders inadequately informed about the nature of the Funds' investments. Rather, they summarily dismiss these disclosures as inadequate "boilerplate cautionary language." Opp. at 17. That ignores what the Prospectuses said:

- "[I]f any required payments of principal and interest are not made with respect to the underlying loans [of an asset-backed security], the Fund may experience loss or delay in receiving payment and a decrease in the value of the security." Prospectus at 43.

- "Defaults on the underlying assets may impair the value of an asset-backed security." *Id.* at 15.

- "The value of asset-backed securities is affected by changes in the market's perception of the asset backing the security. . . ." SAI at 3.

- "The market-value of mortgage-related securities depends on, among other things . . . the payment history of the underlying borrowers." *Id.* at 4.

Further, the Prospectuses informed investors that, because the Funds invested significant portions of their assets in particular types of securities, they were "subject to greater risk of loss as a result of adverse economic, business or other developments than if [their] investments were diversified across different industry sectors" and therefore, "[s]ecurities of issuers held by [the

Funds] may lack sufficient market liquidity to enable [the Funds] to sell the securities at an advantageous time or without a substantial drop in price." Prospectus at 19.  Here again, plaintiffs urge that the Prospectuses should have disclosed current and evolving events such as an increase in mortgage default rates.  *See* Opp. at 18.  But an annual prospectus is not required to discuss ongoing economic events, and plaintiffs cite no authority suggesting that a prospectus is misleading if it fails to do so.  The Prospectuses' specific risk disclosures were not inadequate or misleading, and they in fact correctly warned investors of risks which ultimately came to pass in the market.

Plaintiffs focus on the Prospectuses' alleged failure to disclose accurately the *quantity* of mortgage-related assets in the Funds' portfolios, arguing that shareholders could not have known that the category of Asset-Backed Securities included securities backed by mortgages. According to plaintiffs, the Prospectuses' definition of Asset-Backed Securities "exclude[d] by inference" mortgage-related securities.  Opp. at 15.  This reading of the Prospectuses does not make out a plausible claim that shareholders were misled – led in the *wrong* direction – about the nature of their investments.  *First*, as clearly defined in the Prospectuses, the Asset-Backed Securities category included "securities whose principal and interest payments are supported or collateralized by pools of assets." Prospectus at 43.  Mortgage-related assets such as securities backed by home equity loans fit squarely within this definition.  It is of no consequence that the Asset-Backed Securities definition provided a list of *examples* of the types of assets backing these securities (*e.g.*, auto loans, credit card receivables, leases) that did not include mortgages. On its face, this did not purport to be an exhaustive list of all asset types.  *Second*, the fact that the Prospectuses contained a separate category labeled Mortgage-Backed Securities was not misleading because this was a specifically defined category of assets that did not include all

categories of assets backed by mortgage-related pools, but rather a defined set that included "first deeds of trust or other similar security instruments" of certain defined types of properties. Prospectus at 48.  *Third*, the Schedules of Investments provided to shareholders in the Funds' Annual Reports clearly informed investors that multiple categories of securities contained mortgage-related assets – including the categories of Asset-Backed Securities, Mortgage-Backed Securities and International Debt.  *See, e.g.*, 2006 Annual Report at 9-10.[1]

The Prospectuses explicitly informed investors that the Funds intended to meet their investment objectives by investing in mortgage-related securities and asset-backed securities, that asset-backed securities and mortgage-backed securities were considered "principal" to the achievement of the Funds' investment objectives, and of the associate risks of these investments. Prospectus at 4-5, 15, 19, 43.  Plaintiffs' complaint that the Prospectuses misled investors about the nature of their exposure to mortgage-backed assets because the quantity of such assets was concealed through miscategorization fails to state a plausible claim.

**3.    The Prospectuses' Descriptions of the Funds Were Not Misleading**

As discussed above, plaintiffs do not dispute that the Prospectuses' descriptions of the Yield Plus Fund and the Intermediate Fund disclosed that both Funds would invest in mortgage-related securities, Opp. at 19-20, or that the Prospectuses alerted investors that there were risks specific to these types of investments, Opp. at 4.  Instead, plaintiffs assert that the descriptions of the Funds were nevertheless misleading because they did not accurately reflect the "then-

---

[1] Plaintiffs attempt to explain away the disclosures in the Schedules of Investments by asserting that because not *every* mortgage-related security listed in the Asset-Backed Security category (or other categories) contained a term such as "mortgage" or "home" shareholders were thus misled as to the full extent of the Funds' holdings in mortgage-related securities.  Opp. at 15-16.  But this misses the basic point – that, contrary to plaintiffs' assertions, shareholders were plainly on notice that mortgage-related securities were included within the category of Asset-Backed Securities.

prevailing conditions" in the market, which plaintiffs describe as risks relating to mortgage-related securities that were "materializing throughout the Class Period[s]."[2]  Opp. at 18-20 (citing trends in interest rates, property values, mortgage default rates, home sales, and mortgage lender bankruptcies).

But these so-called "materializing risks" were simply economic trends that plaintiffs believe were "indicators" that mortgage-related securities would face price declines.  A prospectus is not a vehicle for current market commentary, nor is it required to make predictions about market conditions and their potential price impact on portfolio securities.  *See Phillips v. Kidder, Peabody & Co.*, 993 F. Supp. 303, 320-21 (S.D.N.Y. 1996) ("[D]efendant . . . had no duty to report readily available industry trends."); *In re Exabyte Corp. Sec. Litig.*, 823 F. Supp. 866, 871 (D. Colo. 1993) (finding no duty to report "general economic conditions" affecting market); *Braka v. Multibanco Comermex, S.A.*, 589 F. Supp. 802, 805 (S.D.N.Y. 1984) ("[N]o securities seller is bound to make predictions about world economic trends."); *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008) ("The securities laws do not require clairvoyance in the preparation of offering documents . . . .").

With respect to the Yield Plus Fund in particular, plaintiffs argue that the so-called "materializing risks" in the market rendered misleading the Prospectuses' description of the portfolio securities as "high quality."  Opp. at 18.  Plaintiffs "contest[] the quality and value of those securities in light of then-prevailing market conditions."  Opp. at 19.  But this amounts to nothing but a claim that the securities must have been "low quality" because their prices later fell.  Plaintiffs cannot make out a Section 11 or 12 claim on so thin a reed, where the

---

[2] Plaintiffs' Opposition does not address the Complaint's assertion that the Yield Plus Fund's description was false and misleading because it stated the intent to "maintain a portfolio duration of one year or less."  As explained in State Street's Opening Brief, this was an accurate disclosure of the Fund's duration.  *See* Def. Mem. at 14 n.12.

Prospectuses made clear just what they meant by "high quality" securities comprising the portfolio – "investment grade debt instruments, such as mortgage related securities, corporate notes, variable and floating rate notes and asset backed securities," as well as various "derivative securities." Prospectus as 4; Def. Mem. at 12-16.

With respect to the Intermediate Fund, plaintiffs assert a new theory – that the Fund's description was misleading because without disclosure of the "full extent of [the materializing] risks," investors could not evaluate the statement that "Fund investments will primarily be in debt instruments rated investment grade or better." *Compare* Plumbers Compl. ¶ 60 *with* Opp. at 20 (quoting Prospectus at 5).[3] Yet nowhere do plaintiffs allege that the portfolio securities were *not* rated "investment grade," nor could they. There is simply no factual basis to question the veracity of the statement that the Intermediate Fund held only investment grade securities.

### 4. Plaintiffs Cannot Establish Loss Causation, As The Alleged Losses Are Not Causally Connected To Any Alleged Misstatements

The Complaints should also be dismissed because it is apparent on their faces that the alleged losses are not causally connected to any misstatements made in the Prospectuses. *See* 15 U.S.C. §§ 77k(e), 77*l*(b); *see In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 261-62 (S.D.N.Y. 2003). As this Court recently reiterated, in order to show loss

---

[3] Plaintiffs attempt to distinguish the present case from *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 730 (2d Cir. 1998), which held that no reasonable investor could be misled where a prospectus "purported only to compare the Fund's returns to those of the Lehman Brothers indexes." Plaintiffs argue that the Prospectuses misrepresented the risk in the Intermediate Fund by comparing not just the Fund's returns, but also its duration, issue and sector selection to those of its benchmark. However, the Prospectuses' statement that the Intermediate Fund seeks to "manage the Fund's duration to correspond to the [benchmark's] duration while adding value through issue and sector selection" simply explains how the Fund seeks to "match or exceed the return of the [benchmark]." Prospectus at 5. Because the Prospectuses do no more than compare the Intermediate Fund's returns to those of its benchmark, *Hunt* is directly applicable and the Prospectuses' description is not misleading. *See* 159 F.3d at 730.

causation in the Second Circuit, a plaintiff must establish two causal connections: (1) "a connection between the alleged false or misleading statements and one or more events disclosing the truth concealed by that fraud," and (2) "a connection between these events and actual share price declines." *In re Vivendi Universal, S.A. Sec. Litig*, No. 02 Civ. 5571(RJH)(HBP), 2009 WL 920259, at *11 (S.D.N.Y. Mar. 31, 2009) (Holwell, J.) (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).[4]

Plaintiffs allege that "concealed risks materialized" when State Street "belatedly wrote down the market value of the Funds' mortgage-related investments." Opp. at 23; Yu Compl. ¶¶ 76-78; Plumbers Compl. ¶¶ 74-82. But that is just another way of saying: "Portfolio securities prices fell." That cannot satisfy the first required causal nexus between "concealed risks" and "subsequent price declines" because the reduction in values of individual portfolio securities does not reveal any "truth . . . previously concealed." *Vivendi*, 2009 WL 920259, at *10.[5]

In addition, plaintiffs cannot allege a causal connection between this "materialization" and the purported losses incurred by investors. *See id.*; *Lentell*, 396 F.3d at 173. As other courts have noted, mutual funds derive their share prices entirely from the values of the underlying securities, and it is not possible for the revelation of misrepresentations or omissions to affect a mutual fund's NAV. *See, e.g.*, *In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 1173, 1188 (N.D. Cal. 2004) ("[T]he share price of a mutual fund is not affected by alleged misrepresentations or omissions; the share price of a mutual fund is determined by the value of

---

[4] State Street respectfully submits that the recent opinion from the Northern District of California, cited by plaintiffs, has misapplied Second Circuit precedent. *See In re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510 WHA, 2009 WL 262456 (N.D. Cal. Feb. 4, 2009). That court did not apply the more searching causation analysis employed by courts in this district. *See, e.g.*, *Vivendi*, 2009 WL 920259, at **7-11.

[5] In any event, as discussed in Sections 2 and 3, any other risks that might have materialized to cause plaintiffs' purported losses would have been disclosed in the Prospectuses, not concealed.

all underlying securities it holds at a given time."); *see also* Def. Mem. at 30-31 (citing other cases[6]). Rather, plaintiffs' alleged losses were realized when "changed economic circumstances" affected the value of the securities in the Funds' portfolios. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005) (misstatements or omissions themselves must cause plaintiff's loss, not some other "tangle of factors" such as "changed economic circumstances"); Def. Mem. at 29-32. Accordingly, it is evident on the face of the Complaints that no loss causation could be established, and the Complaints should be dismissed.

**5.     The Signatures Alone Of Defendants Leahy, Ross and Swanson Are Insufficient To Support Plaintiffs' Claims Under Section 12(a)(2) or Section 15**

Plaintiffs rely exclusively on the fact that defendants Leahy, Ross and Swanson signed the Prospectuses in order to plead their status as sellers under Section 12(a)(2), Opp. at 26, but "[a] director's act in authorizing the sale of a company's securities is not sufficient to constitute him a seller under § 12(2)." *Mabon, Nugent & Co. v. Borey,* 127 B.R. 727, 735 (S.D.N.Y. 1991) (holding directors' signatures on a registration statement insufficient to confer seller status absent other allegations of solicitation). Plaintiffs also rely exclusively on defendants' signatures to assert their Section 15 claims, Opp. at 30, but fail to provide a single case in which courts of this jurisdiction have found a defendant's signature *alone* a sufficient allegation of control under Section 15.[7] Accordingly, plaintiffs' Section 12(a)(2) and Section 15 claims should also be dismissed.

---

[6] Plaintiffs fail to distinguish the cases cited by State Street. Although plaintiffs point out that some of those cases were brought under the Exchange Act, where loss causation is an element that must be pled, plaintiffs do not – and cannot – take issue with the relevant principle in those cases that a corrective disclosure in the mutual fund context simply cannot affect the value of the securities in the portfolio.

[7] The two cases on which plaintiffs primarily rely "include[d] allegations that [were] specific to individual Director Defendants." *In re WorldCom, Inc. Sec. Litig*., 294 F. Supp. 2d 392, 403 (S.D.N.Y. 2003) (finding complaint sufficiently alleged control as to signing directors who also

## CONCLUSION

For the reasons provided above, as well as those set forth in State Street's Opening Brief, the Amended Complaints should be dismissed with prejudice.

Dated: April 20, 2009

Respectfully submitted,

ROPES & GRAY LLP

By /s/ John D. Donovan, Jr.
John D. Donovan, Jr.
Harvey J. Wolkoff
Robert A. Skinner
One International Place
Boston, Massachusetts 02110
(617) 951-7000
john.donovan@ropesgray.com
harvey.wolkoff@ropesgray.com
robert.skinner@ropesgray.com

*Attorneys for Defendants*
*State Street Corporation, State Street Global*
*Advisors, SSgA Funds, Peter G. Leahy,*
*James Ross and Mark E. Swanson*

---

held positions on Committees responsible for reviewing accounting controls at issue in litigation).

11782142.DOC                                  - 11 -