UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re STATE STREET BANK AND TRUST CO. FIXED INCOME FUNDS INVESTMENT LITIGATION | : | MDL No. 1945 |
| | : | |
| | : | |
| | : | |
| NING YU, On Behalf of Himself and All Others Similarly Situated, | : | Civil Action No. 1:08-cv-08235-RJH |
| | : | (Relates to MDL No. 1945) |
| | : | |
| Plaintiff, | : | CLASS ACTION |
| | : | |
| vs. | : | |
| | : | |
| STATE STREET CORPORATION, et al., | : | |
| | : | |
| Defendants. | : | |

SECOND AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Anatoly Alexander ("Plaintiff") makes the following allegations, except as to allegations specifically pertaining to himself and his counsel, based upon the investigation undertaken by Plaintiff's counsel, including the analysis of public filings, publicly available news articles and reports about State Street Corporation, State Street Global Advisors and the Yield Plus Fund, as well as press releases, investor communications and other public statements issued by Defendants, and media reports about the Defendants.  The allegations in this Complaint are also supported by analyses of various proprietary financial resources (*e.g.*, Bloomberg "Security Descriptions" and pricing history sources).

Plaintiff's allegations are further bolstered by internal State Street documents that Plaintiff obtained through his Court-approved monitoring of discovery in the multidistrict litigation, captioned *In re: State Street Bank and Trust Co. Fixed Income Funds Investment Litigation*, 1:08-md-01945-RJH (the "MDL Action").  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after he is afforded a reasonable opportunity for his own discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons and entities (other than Defendants and certain others identified below) who purchased shares of the SSgA Yield Plus Fund (Ticker: SSYPX) (the "Yield Plus Fund" or "Fund") between July 1, 2005 and June 30, 2008 (the "Class Period"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") (the "Class").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].  In connection with the acts complained of, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act [15 U.S.C. §77v].

4.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b).

## PARTIES

5.      Lead Plaintiff Anatoly Alexander acquired shares of the Yield Plus Fund, pursuant and/or traceable to several Registration Statements (defined below) accompanying the issuance of the Yield Plus Fund as set forth in his certification that was previously filed in this case and is incorporated herein by reference, and has been damaged thereby.

6.      Defendant State Street Corporation ("State Street") (NYSE: STT) is one of the world's largest global financial services companies.  Through its subsidiaries, State Street provides a range of products and services for investors worldwide.  It operates in two divisions, Investment Servicing and Investment Management.  These divisions provide a range of products and services, which include mutual funds and other collective investment funds, corporate and public retirement plans, insurance companies, foundations, endowments and other investment pools, and investment managers.

7.      Defendant State Street Global Advisors ("SSgA") is the investment management arm of State Street.  SSgA focuses on delivering investment strategies and integrated solutions to institutional and individual investors worldwide.

8.      Defendant SSgA Funds is organized as a Massachusetts business trust and is an unincorporated business trust organized under the laws of the Commonwealth of Massachusetts. SSgA Funds engages in business as an open-end management investment company and is registered as such under the Investment Company Act of 1940.

9.      The Yield Plus Fund was offered by SSgA and was managed by the SSgA Global Fixed Income Team and was one of the funds offered by SSgA Funds.  The Yield Plus Fund's initial registration statement was filed with the Securities and Exchange Commission ("SEC") on November 9, 1992.

10.     The Defendants named in ¶¶6-9 are collectively referred to herein as the "State Street Defendants."

11.     Defendant Lynn L. Anderson ("Anderson") was President and Chairman of the Board of State Street and SSgA Funds and a trustee of SSgA Funds and the Fund at times relevant herein. Anderson signed each of the Registration Statements.  He was paid for his services as an officer and trustee, including $85,561 for serving as a trustee of the SSgA Funds for the fiscal year ended August 31, 2006.

12.     Defendant Peter G. Leahy ("Leahy") was a trustee of SSgA Funds and the Fund at times relevant herein.  Leahy signed the Registration Statements filed on December 18, 2006 and December 18, 2007.

13.     Defendant William L. Marshall ("Marshall") was a trustee of SSgA Funds and the Fund at times relevant herein.  Marshall signed each of the Registration Statements.  He was paid for his services as a trustee, including $143,010 for the fiscal year ended August 31, 2006.

14.     Defendant Steven J. Mastrovich ("Mastrovich") was a trustee of SSgA Funds and the Fund at times relevant herein.  Mastrovich signed each of the Registration Statements.  He was paid for his services as a trustee, including $137,777 for the fiscal year ended August 31, 2006.

15.     Defendant Patrick J. Riley ("Riley") was a trustee of SSgA Funds and the Fund at times relevant herein.  Riley signed the Registration Statements filed on December 16, 2005,

December 18, 2006 and December 18, 2007.  He was paid for his services as a trustee, including $145,937 for the fiscal year ended August 31, 2006.

16.    Defendant James Ross ("Ross") was President (principal executive officer) of State Street Master Funds and the Fund at times relevant herein.  Ross signed the Registration Statements filed on December 16, 2005, December 18, 2006 and December 18, 2007.

17.    Defendant Richard D. Shirk ("Shirk") was a trustee of SSgA Funds and the Fund at times relevant herein.  Shirk signed each of the Registration Statements.  He was paid for his services as a trustee, including $133,669 for the fiscal year ended August 31, 2006.

18.    Defendant Mark E. Swanson ("Swanson") was a Treasurer (principal financial officer) of State Street and the Fund at times relevant herein.  Swanson signed each of the Registration Statements.

19.    Defendant Bruce D. Taber ("Taber") was a trustee of SSgA Funds and the Fund at times relevant herein.  Taber signed each of the Registration Statements.  He was paid for his services as a trustee, including $144,059 for the fiscal year ended August 31, 2006.

20.    Defendant Henry W. Todd ("Todd") was a trustee of SSgA Funds and the Fund at times relevant herein.  Todd signed each of the Registration Statements.  He was paid for his services as a trustee, including $136,502 for the fiscal year ended August 31, 2006.

21.    Each of the Defendants named in ¶¶11-20 (the "Individual Defendants") prepared, reviewed and/or signed or authorized the signing of some or all of the Registration Statements for the offering of shares of the Yield Plus Fund at times relevant herein.

22.    The Board of Trustees is responsible for overseeing generally the management, activities and affairs of each fund and has approved contracts with various financial organizations to provide, among other services, day-to-day management required by the Fund.  There are four

committees of the Board of Trustees: (i) the Audit Committee; (ii) the Valuation Committee; (iii) the Governance Committee and the Nominating Sub-Committee; and (iv) the Legal and Compliance Committee.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class.  Excluded from the Class are Defendants, the officers and directors of the Defendant companies, at all relevant times, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, heirs, successors or assigns and any such excluded party.

24.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Defendants, or specifically by SSgA Funds, the Yield Plus Fund or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' conduct in violation of federal law that is complained of herein.  Plaintiff does not have any interests antagonistic to, or in conflict with, the other members of the Class.

- 5 -

26.     Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class and has retained counsel competent and experienced in class and securities litigation.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)     whether the Registration Statements negligently omitted and/or misrepresented material facts about the Fund;

(c)     whether the Registration Statements contained untrue statements of material fact; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

28.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Yield Plus Fund and Relevant SEC Filings

29.     On or about November 9, 1992, Defendants began offering shares of the Yield Plus Fund pursuant to an initial registration statement, filed with the SEC.

30.     The Yield Plus Fund is internally referred to at State Street as "2D07."

31.     Defendants annually filed nearly identical registration statements and prospectuses throughout the Class Period in connection with the continuous offerings of the Yield Plus Fund's shares. The Fund's shares were issued to investors pursuant to a series of registration statements and prospectuses that formed part of the registration statements filed with the SEC and made effective during the Class Period, which are referred to collectively herein as the "Registration Statements," including the following:

      (a)     Registration Statement and Prospectus filed on December 20, 2004;

      (b)     Prospectus dated December 20, 2004 filed on December 23, 2004;

      (c)     Registration Statement and Prospectus filed on December 16, 2005;

      (d)     Registration Statement and Prospectus filed on December 18, 2006;

      (e)     Prospectus dated December 18, 2006 and filed on December 22, 2006;

      (f)     Prospectus filed on September 17, 2007;

      (g)     Prospectus Supplement filed on October 10, 2007;

      (h)     Registration Statement and Prospectus filed on December 18, 2007;

      (i)     Prospectus Supplement filed on December 21, 2007;

      (j)     Prospectus Supplement filed on January 25, 2008; and

      (k)     Prospectus Supplement filed on April 2, 2008.

32.     The prospectuses expressly incorporated by reference a Statement of Additional Information ("SAI") and the Fund's Annual Report for that year, each of which provided investors with additional guidance about, *inter alia*, the Fund's investment strategies and limitations. The Fund filed Annual Reports with the SEC on Form N-CSR on October 27, 2005, November 2, 2006 and November 8, 2007, which were part of the Registration Statements.

33. The Registration Statements referred investors seeking more information to the SAI, which "may contain more details on the Investment Policies" of the Fund. Defendants reissued and updated the SAIs throughout the relevant time period. The Registration Statements direct investors to review the SAIs, Annual Reports and Semi-Annual Reports for additional information. Disclosure of each Fund's complete holdings is required to be made quarterly within 60 days of the end of each fiscal quarter in the Annual Report and Semi-Annual Report to Fund shareholders and in the quarterly holdings report on Form N-Q. The Annual Reports, Semi-Annual Reports and Form N-Qs were part of the Registration Statements. The following Form N-Qs identifying the holdings of the Yield Plus Fund were filed during the Class Period:

(a) Form N-Q filed on July 29, 2005, relating to the period ending May 31, 2005;

(b) Form N-Q filed on January 26, 2006, relating to the period ending November 30, 2005;

(c) Form N-Q filed on July 28, 2006, relating to the period ending May 31, 2006;

(d) Form N-Q filed on January 29, 2007, relating to the period ending November 30, 2006;

(e) Form N-Q filed on July 30, 2007, relating to the period ending May 31, 2007; and

(f) Form N-Q filed on January 29, 2008, relating to the period ending November 30, 2007.

34. Each member of the Class purchased shares of the Yield Plus Fund pursuant to the Registration Statements.

**The Yield Plus Fund Heavily Invested in Risky Mortgage-Related Securities**

35. The Registration Statements misrepresented the extent of the Fund's exposure to mortgage-related securities. The Registration Statements listed securities by type, including, Asset-

Backed Securities, Corporate Bonds and Notes, International Debt, Mortgage-Backed Securities, and U.S. Government Agencies. The grouping of securities in the Registration Statements was materially misleading because they understated the Fund's true exposure to high risk mortgage-related securities because mortgage-related (including mortgage-backed) securities were listed under other groups, such as the Asset-Backed Securities and International Debt. The groupings were also misleading because they obfuscated the fact that the Fund did not have a truly diversified portfolio among the various categories of debt securities.

36. During the Class Period, Defendants devoted an increasingly large portion of the Fund's investments to financial instruments that included asset-backed securities that overwhelmingly derived their value from home mortgages, home-equity loans, mortgage-backed securities, swaps, derivatives and other exotic financial instruments, thereby materially increasing the Fund's exposure to the mortgage and sub-prime mortgage market. The description of Asset-Backed Securities in the Registration Statements, however, excluded mortgage-related and mortgage-backed securities. Similarly, the Registration Statements did not describe or define the International Debt to include mortgage-related securities, even though a significant portion of those securities were mortgage-related.

37. For example, prior to the start of the Class Period, as of February 28, 2003, State Street disclosed that 5.9% of the Yield Plus Fund's portfolio was comprised of mortgage-backed securities. By May 31, 2005, State Street stated that mortgage-backed securities had grown to comprise 13% of the Yield Plus Fund's portfolio. By November 30, 2007, the disclosed percentage reached 16.9%. As discussed below, however, Defendants substantially understated the Yield Plus Fund's exposure to mortgage-related (including mortgage-backed) securities during the Class Period. Many of the securities were tied to risky sub-prime mortgages.

38.     Defendants continued this risky investment strategy during 2006, 2007 and 2008. These high-risk investments directly exposed the Fund to the risk and volatility of the sub-prime mortgage market at precisely the time when it was publicly-reported and known to Defendants that defaults of sub-prime mortgages were skyrocketing and that numerous sub-prime lenders were facing insolvency.  Deposition testimony in the MDL Action establishes that State Street employees involved with the management of State Street's bond funds were aware of these public reports.

39.     At the same time the mortgage meltdown that caused an economic crisis in the United States was occurring, the Yield Plus Fund significantly increased its exposure to risky mortgage-related securities.  Based upon internal State Street documents and secondary financial resources, 40% to more than 85% of the Yield Plus Fund's overall portfolio was comprised of mortgage-backed securities over the course of the Class Period.  By way of example, as of June 2006, 69.50% of the Yield Plus Fund's portfolio was invested in mortgage-backed securities.  That percentage rose to 76.76% in September 2006, 83.54% in January 2007, 85.13% in May 2007, and 85.22% in August 2007.

40.     The Yield Plus Fund's overwhelming weighting in Mortgage-Backed Securities was not disclosed to investors.  And, as alleged in greater detail below (*see, infra*, ¶¶71-118), the Registration Statements did not accurately disclose the percentage of holdings in mortgage-related and/or mortgage-backed securities held by the Yield Plus Fund.  The Fund's exposure to the mortgage crisis was significantly greater than represented by the sector allocation set forth in the Schedules of Investments for the Fund.

41.     The Fund's overwhelming concentration in mortgage-related securities continued into 2008.

42.     In general, during the Class Period, the Yield Plus Fund's portfolio was comprised of a significant number of securities with mortgage products (*see, infra*, ¶¶71, 73 and 77). Furthermore, unbeknownst to investors, a sizeable percentage of those mortgage-related investments were in sub-prime mortgages, rendering the Fund much riskier than represented.  Indeed, as of June 2006, 22.34% of the Yield Plus Fund's portfolio was invested in sub-prime mortgages.  That percentage rose to 24.74% in September 2006, 27.33% in January 2007, 28.05% in March 2007, and 26.89% in May 2007.  These facts were not disclosed to investors.

### The Meltdown of the Sub-prime Mortgage Industry and Mortgage-Related Securities

43.     In June 2004, the U.S. Federal Reserve signaled that it would begin to increase key short-term interest rates.  As a result, the U.S. prime interest rate, which had remained flat at four percent for more than a year, climbed steadily throughout 2005 and 2006 before reaching 8.25% in June 2006.  As key short-term and the prime rates rose, other interest rates rose as well, including those for most residential mortgage loans.  This rise in interest rates made it more difficult for borrowers to meet their payment obligations, particularly since many of the borrowers of the sub-prime mortgage pools held adjustable rate mortgages.

44.     As illustrated in the chart below, at the same time that interest rates were rising, U.S. property value appreciation began to slow significantly and actually began a decline in several U.S. markets during 2006:



45.     The combination of higher interest rates and the dramatic slowing of U.S. property appreciation was devastating to U.S. non-prime borrowers who over-extended themselves by purchasing homes that they could not afford without low initial "teaser" mortgage interest rates. Previously, when property values were increasing, non-prime borrowers were able to refinance their loans as mortgages adjusted to higher interest rates.  As interest rates rose and property prices leveled, many non-prime U.S. borrowers were unable to refinance their existing loans when they could not meet their payment obligations.  The result – beginning in 2005 – was a significant increase in U.S. mortgage default rates, particularly for sub-prime mortgage loans.

46.     For example, in August 2005, HSBC Holdings PLC ("HSBC") issued a memo to companies from which it was buying loans.  The paper, called "Threads of Early Payment Default," reported that delinquencies were rising.  HSBC said mortgage lenders had seen "a wealth of surprising data" on loans originated in 2005, including "surges" in 60-day-past-due delinquencies, particularly on "borrower-friendly" second lien loans, and "heightened fraud incidents."  When

borrowers didn't have to verify their incomes, the report said they were overstating them, and they bolstered their false claims by overstating their job positions.

47.    An August 23, 2006 story on CBS' *MarketWatch* noted, "July was dry for the U.S. real estate market, as sales of existing homes plunged 4.1% to a two-year low, prices stagnated and the number of homes on the market soared to a 13-year high, according to a report from the National Association of Realtors released Wednesday."

48.    On August 29, 2006, *Dow Jones Newswires* reported "[m]ore subprime borrowers are defaulting in the early months of their home loans, a trend that has led to greater fear among investors and lenders of rising delinquencies and losses."

49.    A September 15, 2006, article on *CNNMoney.com* noted:

In August, 115,292 properties entered into foreclosure, according to RealtyTrac, an online marketplace for foreclosure sales. That was 24 percent above the level in July and 53 percent higher than a year earlier.

It was the second highest monthly foreclosure total of the year; in February, 117,151 properties entered foreclosure.

Some of the bellwether real estate market states are among the leading foreclosure markets. Florida had more than 16,533 properties in foreclosure in August. That led all states and was 50 percent higher than in July and 62 percent higher than in August 2005.

California foreclosures are increasing at an even faster annual rate, up 160 percent since last year to 12,506. And the formerly red-hot Nevada market recorded a spike of 24 percent compared with July and a whopping 255 percent increase from August 2005.

*        *        *

Usually, foreclosures are a lagging [market] indicator [ ] But we've never had a situation like this with adjustable-rate mortgages amounting to $400 billion to $500 billion coming up for adjustment over the rest of the year.

*        *        *

These exotic mortgages, which have been issued by lenders at much higher numbers the past few years, default at a higher rate than do fixed-rate mortgages. And sub-

- 13 -

prime loans, which are much more common than in the past, have a higher default rate as well.

50.     On November 13, 2006, *American Banker* reported:

UBS Securities issued a report last week that found that sub-prime loans made this year are "going bad" at a rate that is 50% faster than the rate for those made last year. About 2.4% of sub-prime loans originated this year were more than 60 days delinquent by the sixth month, compared with 1.6% for 2005 loans and 0.9% for 2004 loans, the report said.

51.     On November 30, 2006, the *National Mortgage News* reported:

"How bad is 2006 sub-prime collateral is a question I think most of you have an opinion on already," said Mr. Zimmerman [the Executive Director of UBS Securities].  We were a bit surprised at the magnitude and speed at which this vintage year deteriorated.

Mr. Liu [a Director at UBS Securities] pointed out at the conference that the industry is seeing "a steady increase of delinquencies and that rate has been accelerating over the past two to three months." Not only have there been higher delinquencies but also the delinquency numbers have been showing up earlier in 2006 than they had been in 2005.  "2006 is tapped to be the worst vintage ever," he said.

*Foreclosures have also risen.  And the foreclosures, like the delinquency rates, are also happening at earlier dates*.

(Emphasis added.)

52.     On December 13, 2006, the *Associated Press* reported:

*U.S. mortgage delinquency rate rises sharply*

Late Mortgage Payments Jump in Summer

*Late mortgage payments shot up in the third quarter as higher interest rates squeezed budgets and made it harder for homeowners – especially those with weaker credit records – to keep up with their monthly obligations*.

The Mortgage Bankers Association, in its quarterly snapshot of the mortgage market released Wednesday, reported that the percentage of mortgage payments that were 30 or more days past due for all loans tracked jumped to 4.67 percent in the July-to-September quarter.

That marked a sharp rise from the second quarter's delinquency rate of 4.39 percent and was the worst showing since the final quarter of last year, when delinquent payments climbed to a 2 1/2-year high in the aftermath of the devastating Gulf Coast hurricanes.

- 14 -

The association's survey covers 42.6 million loans.

Delinquency rates in the third quarter were considerably higher for "subprime" borrowers – people with weaker credit records who are considered higher risks – especially those who have adjustable-rate mortgages.

Subprime borrowers had a delinquency rate of 12.56 percent in the third quarter, ***the highest in more than three years***. The delinquency rate for these borrowers holding adjustable-rate mortgages was even higher -- at 13.22 percent in the third quarter, also the worst reading in more than three years.

(Emphasis added.)

53.     By early 2007, some of the top mortgage lenders with sub-prime U.S. mortgage exposure started to reveal enormous losses and warned of future market losses. For example, on February 7, 2007, citing trouble with the U.S. sub-prime lending market, HSBC announced that provisions for bad loans would be 20% higher than analysts expected. On that the same day, New Century Financial, the second largest sub-prime mortgage originator in the U.S., reported significant problems with loan defaults.

54.     Indications of turmoil in the U.S. sub-prime mortgage market continued as other mortgage lenders, including Countrywide Financial and Washington Mutual, reported huge losses. According to a February 9, 2007 article published by *The Wall Street Journal*, foreclosure rates on sub-prime mortgage loans in 2006 ***more than doubled*** from 2005.

55.     By March 2007, several lenders, including Fremont General Corporation and New Century Financial, exited the sub-prime residential real estate lending business completely. Then, on April 2, 2007, New Century Financial Corporation announced that it was filing for Chapter 11 bankruptcy protection.

56.     Accordingly, during the Class Period, the following U.S. mortgage market events had occurred: (a) mortgage interest rates were trending higher; (b) home prices had stagnated and began to fall; (c) there was a dramatic rise in sub-prime mortgage loans delinquency rates; (d) there was a

- 15 -

significant increase in early payment defaults on non-prime mortgage loans; and (e) sub-prime and Alt-A mortgage loan originators were closing or winding down business.

57.     In addition, numerous reports were published about non-prime loans being associated with rampant mortgage fraud, and public indices, like the ABX Index, which tracks the cost of buying protection [*i.e.*, CDSs] for sub-prime mortgage-backed securities, indicated that sub-prime mortgage loan risk had increased dramatically.

58.     These factors were strong indicators that the problems being experienced by sub-prime lenders would generate huge losses for mortgage-related securities, such as those held by the Fund.   These factors also rendered many mortgage-related securities, particularly sub-prime mortgage-backed securities, illiquid and speculative.   In addition, as a result of the foregoing, the presence of and amount of sub-prime securities (and mortgage-related securities) in a mutual fund such as the Yield Plus Fund were material facts necessary to make the statements made by the funds not misleading.

59.     In deposition testimony provided in the MDL Action, executives of State Street acknowledged that, by 2006 and early 2007, they were aware of news reports and analysts opinions regarding the housing and mortgage crises.

### The Stated Investment Objectives of the Yield Plus Fund

60.     The State Street Defendants and the Individual Defendants marketed the Yield Plus Fund as an alternative to a money market fund and compared the returns of the Yield Plus Fund to the J.P. Morgan 3-month LIBOR Index.   The Registration Statements stated that the investment objective of the Yield Plus Fund was to "seek high current income and liquidity."

61.     State Street's Registration Statements stated that the Yield Plus Fund's investment objective would be met by investing in a "diversified portfolio" of debt securities.

- 16 -

62.     State Street's Registration Statements stated that the Yield Plus Fund's investment objective would be met by investing in "high-quality" debt securities.

63.     The Registration Statements fully described the Yield Plus Fund as follows:

**Yield Plus Fund**.  ***The nonfundamental investment objective is to seek high current income and liquidity by investing primarily in a diversified portfolio of high-quality debt securities*** and by maintaining a portfolio duration of one year or less.

***The Fund attempts to meet its objective by investing primarily in high-quality, dollar-denominated debt instruments, such as mortgage related securities, corporate notes, variable and floating rate notes and asset-backed securities***.  The Fund may also invest in derivative securities, including interest rate swaps, credit default swaps, total return swaps, interest rate caps, floors and collars, futures, options, and other structured securities.  Unlike the price of a money market fund, the price of the Yield Plus Fund will fluctuate because the Fund may invest in securities with higher levels of risk and different maturities.  The Fund will actively trade to benefit from short-term yield disparities among different issues of fixed-income securities, or otherwise to increase income.

The Yield Plus Fund considers the following instruments or investment strategies to be principal to the achievement of its investment objective.  Please see "Additional Information about the Funds' Investment Policies and Risks" in this Prospectus: Variable and floating rate securities; asset-backed securities; cash sweep; debt securities; investment default swaps, total return swaps, and interest rate caps, floors and collars; Eurodollar certificates of deposit, Eurodollar time deposits, and Yankee certificates of deposit; Section 4(2) commercial paper, repurchase agreements; portfolio duration; and options on securities and securities indexes.

***The Yield Plus Fund is subject to the following risks, as described under "Principal Risks:" Asset-backed securities, call, credit/default, derivatives, dollar-denominated instruments, extension, government securities, income, interest rate, liquidity, management, market, mortgage-backed securities, prepayment and sector***.

(Emphasis added.)

### Investments of the Yield Plus Fund

64.     The Yield Plus Fund held both Long-Term Investments and Short-Term Investments. During the Class Period, the Yield Plus Fund's portfolio was comprised of mostly Long-Term

Investments. The Annual Reports, Semi-Annual Reports and Form N-Qs included a list of the securities held by the Yield Plus Fund (the "Schedule of Investments").

65.    State Street divided the Yield Plus Fund's Long-Term Investments into various underlying sectors. The Long-Term Investment sectors that were identified in the Schedules of Investments during the Class Period included "Asset-Backed Securities," "Corporate Bonds and Notes," "International Debt" and "Mortgage-Backed Securities."

66.    In the Registration Statements for the Fund, State Street defined "Asset-Backed Securities" as follows:

> **Asset-Backed Securities**. *Asset-backed securities are securities whose principal and interest payments are collateralized by pools of assets such as auto loans, credit card receivables, leases, installment contracts and personal property.* Payments of principal and interest are passed through to holders of the securities and are typically supported by some form of credit enhancement, such as over collateralization, a letter of credit, surety bond, limited guarantee by another entity or by priority to certain of the borrower's other securities. The degree of credit enhancement varies, generally applying only until exhausted and covering only a fraction of the security's par value. If the credit enhancement of an asset-backed security held by a Fund has been exhausted, and if any required payments of principal and interest are not made with respect to the underlying loans, the Fund may experience loss or delay in receiving payment and a decrease in the value of the security.
>
> • Prepayment Risk—*Like mortgage-backed securities, asset-backed securities are often subject to more rapid repayment than their stated maturity date would indicate* as a result of the pass-through of prepayments of principal on the underlying loans. During periods of declining interest rates, prepayment of loans underlying asset-backed securities can be expected to accelerate. A Fund's ability to maintain positions in such securities will be affected by reductions in the principal amount of such securities resulting from prepayments, and its ability to reinvest the returns of principal at comparable yields is subject to generally prevailing interest rates at that time. To the extent that a Fund invests in asset-backed securities, the values of such Fund's portfolio securities will vary with changes in market interest rates generally and the differentials in yields among various kinds of asset-backed securities.
>
> • Other Risk Associated with Asset-Backed Securities—*Asset-backed securities present certain additional risks that are not presented by mortgage-backed securities because <u>asset-backed securities generally do not have the benefit of a security interest in collateral that is comparable to mortgage assets</u>.* Credit card receivables are generally unsecured and the debtors on such receivables are entitled

to the protection of a number of state and federal consumer credit laws, many of which give such debtors the right to set-off certain amounts owed on the credit cards, thereby reducing the balance due. Automobile receivables generally are secured, but by automobiles rather than residential real property. Most issuers of automobile receivables permit the loan servicers to retain possession of the underlying obligations. If the servicer were to sell these obligations to another party, there is a risk that the purchaser would acquire an interest superior to that of the holders of the asset-backed securities. In addition, because of the large number of vehicles involved in a typical issuance and technical requirements under state laws, the trustee for the holders of the automobile receivables may not have a proper security interest in the underlying automobiles. Therefore, there is the possibility that, in some cases, recoveries on repossessed collateral may not be available to support payments on these securities.

(Emphasis added.)

67.    In its Registration Statements, State Street defined "Mortgage-Backed Securities" as

follows:

**Mortgage-Backed Securities.** *Each mortgage pool underlying mortgage-backed securities consists of mortgage loans evidenced by promissory notes secured by first mortgages or first deeds of trust or other similar security instruments creating a first lien on owner occupied and non-owner occupied one-unit to four-unit residential properties,* multifamily (i.e., five or more) properties, agricultural properties, commercial properties and mixed use properties (the "Mortgaged Properties"). The Mortgaged Properties may consist of detached individual dwelling units, multifamily dwelling units, individual condominiums, townhouses, duplexes, triplexes, fourplexes, row houses, individual units in planned unit developments and other attached dwelling units. The Mortgaged Properties may also include residential investment properties and second homes.

Types of *mortgage-related securities* in which a Fund may invest include: Government National Mortgage Association (GNMA) Certificates (Ginnie Maes), Federal Home Loan Mortgage Corporation (FHLMC) Mortgage Participation Certificates (Freddie Macs), Federal National Mortgage Association (FNMA) Guaranteed Mortgage Certificates (Fannie Maes) and Commercial Mortgage-Backed Securities (CMBS). Mortgage certificates are mortgage-backed securities representing undivided fractional interests in pools of mortgage-backed loans. These loans are made by mortgage bankers, commercial banks, savings and loan associations and other lenders.

(Emphasis added.)

68.    The description of the Yield Plus Fund in the Registration Statements stated that the

Fund is subject to certain risks under the "Principal Risks" section, including "asset-backed

securities" and "mortgage-backed securities" risks.  In a section titled "Principal Risks," the

Registration Statements stated, in pertinent part, as follows:

PRINCIPAL RISKS

\*       \*       \*

Each of the Funds has risks associated with it.  This section contains a detailed
description (arranged alphabetically) of the risks associated with a Fund, as identified
in "Principal Investment Strategies" above. Information about the specific
instruments or investment techniques referred to in this section is contained in the
section called "Additional Information about the Funds' Investment Policies and
Risks."

\*       \*       \*

**Asset-Backed Securities Risk**.  Asset-backed securities are obligations whose
principal and interest payments are supported or collateralized by pools of other
assets, such as automobile loans, credit card receivables and leases.  Defaults on the
underlying assets may impair the value of an asset-backed security.  Furthermore,
there may be legal and practical limitations on the enforceability of any security
interest granted with respect to those underlying assets.  Asset-backed securities are
also subject to prepayment risk.

\*       \*       \*

**Mortgage-Backed Securities Risk**.  Mortgage-backed securities represent either
direct or indirect participation in, or obligations collateralized by and payable from,
mortgage loans secured by real property.  The investment characteristics of
mortgages differ from those of traditional fixed-income securities. These differences
can result in significantly greater price and yield volatility than is the case with
traditional fixed-income securities.  Furthermore, mortgage-backed securities are
subject to prepayment risk as described elsewhere in this section.  Mortgage-backed
securities may also be subject to call risk and extension risk, as described elsewhere
in this section.

**The Registration Statements and Prospectuses Contained Inaccurate Statements
of Material Fact and Omitted Material Information Required to Be Disclosed Therein**

69.     Throughout the Class Period, Defendants issued and offered for sale shares of the

Fund.  The Registration Statements, including Prospectuses, N-Qs, SAIs and Annual and Semi-

Annual Reports used throughout the Class Period to register and offer shares of the Fund to Plaintiff

and the Class contained untrue statements of material facts and omitted material facts necessary to

make the statements therein not misleading.  Even though the Registration Statements issued during the Class Period were not perfectly identical, they did contain many of the same untrue statements set forth below and were rendered misleading by the same omissions.

70.     As alleged below, the Registration Statements misrepresented the nature of the securities or investments held by the Yield Plus Fund (including the concentration of Mortgage-Backed Securities), misrepresented the description and/or objectives of the Fund and misrepresented the Fund's exposure to risky mortgage-related assets and the risk of investing in the Fund.  Also, despite disclosing that the Yield Plus Fund would maintain a diversified portfolio, it did not; despite stating that the Fund invested in "high quality" securities, it did not; and despite disclosing that an objective of the Fund was to maintain "liquidity," it did not.  The misrepresented descriptions and/or objectives concealed the risk of the Fund, which caused (or exacerbated) the losses to Plaintiff's and other Class members' investment in the Fund after the risk materialized.  Each of the misstatements or omissions concealed the actual risk of investing in the Yield Plus Fund and caused or played some part in diminishing the market value of the Fund.

71.     According to internal State Street analytics obtained in discovery in the MDL Action, the Registration Statements misrepresent the Fund's exposure to Mortgage-Backed Securities.  Below is a summary chart, for a sampling of time-frames during the Class Period contrasting the amount of Mortgage-Backed Securities held by the Yield Plus Fund as represented in the Fund's Schedule of Investments with the amount of Mortgage-Backed Securities held by the Fund as represented by State Street's internal analytics:

*Percentage of Mortgage-Backed Securities Held by the Yield Plus Fund*

| Time Frame | % Publicly Disclosed to Investors in Schedule of Investments | % Disclosed in State Street's Non-Public Internal Analytic |
|---|---|---|
| May 31, 2006 | 13% | 75.5% |
| August 31, 2006 | 11.3% | 72.86% |
| November 30, 2006 | 14.1% | 83.49% |
| February 28, 2007 | 15.9% | 84.28% |
| May 31, 2007 | 14% | 86.71% |
| August 31, 2007 | 13.8% | 76.24% |
| November 30, 2007 | 16.9% | 75.67% |

72.    The Annual Reports, Semi-Annual Reports, and Form N-Qs containing the Schedules of Investments reflected in the chart in ¶71 misrepresented the percentage of Mortgage-Backed Securities held by the Yield Plus Fund during the Class Period. Each disclosure regarding the allocation of the Fund's portfolio was, in effect, an inaccurate statement of material fact when made.

73.    More specifically, the two charts below reflect the Yield Plus Fund's investment composition, as of May 31, 2007, as disclosed to investors by State Street versus the manner in which the investment composition was recognized internally by State Street:

As Disclosed to Investors
State Street Form N-Q, July 30, 2007
For the period ending May 31, 2007

| Categories | % of Net Assets |
|---|---|
| Asset-Backed Securities | 60.4% |
| International Debt | 24.8% |
| Mortgage-Backed Securities | 14% |
| Short-Term Investments | .8% |

As Maintained Internally -
State Street Portfolio Analytic
as of May 31, 2007

| Categories | % of Net Assets |
|---|---|
| Asset-Backed Securities | 2.77% |
| Commercial Mortgage-Backed Securities | 1.58% |
| Home Equity | .68% |
| Mortgage-Backed Securities - Aussie | 6.71% |
| Mortgage-Backed Securities - UK | 15.83% |
| Mid-Prime Residential Mortgage-Backed Securities | 28.48% |
| Prime Residential Mortgage-Backed Securities | 7.22% |
| Sub-prime Residential Mortgage-Backed Securities | 26.89% |
| Business Loans | 4.90% |
| Student Loans | 4.19% |

- 22 -

| As Disclosed to Investors<br>State Street Form N-Q, July 30, 2007<br>For the period ending May 31, 2007 | | As Maintained Internally -<br>State Street Portfolio Analytic<br>as of May 31, 2007 | |
|---|---|---|---|
| **Categories** | **% of Net Assets** | **Categories** | **% of Net Assets** |
| | | Cash | 0.9925.76% |

*Total Mortgage-Backed Securities – 86.71%*
*Total Mortgage-Related Securities – 87.39%*

74.     Based upon State Street's own analytic, 87.39% of the securities held in the Yield Plus Fund portfolio, as of May 31, 2007, were mortgage-related and, according to their own labeling or sectoring, 86.71% of the portfolio was invested in "Mortgage-Backed Securities" (*see, supra,* ¶¶71 and 73 (charts)). Moreover, according to State Street's internal labeling, 26.89% of the Yield Plus Fund's overall portfolio was invested in sub-prime mortgages (*see, supra,* ¶73 (chart)).

75.     The disclosure in the July 30, 2007 Form N-Q that, as of May 31, 2007, the Yield Plus Fund was 14% invested in "Mortgage-Backed Securities" (*see, supra,* ¶¶71 and 73 (charts)) and 60.4% invested in Asset-Backed Securities (*see, supra,* ¶73 (chart)) were inaccurate statements of material fact when made.

76.     Markedly, State Street disclosed to shareholders that the Yield Plus Fund held three (3) sectors of long term investments – Asset-Backed Securities, International Debt and Mortgage-Backed Securities (*see, supra,* ¶73 (chart)). Internally, however, State Street monitored the Yield Plus Fund's long term investments in at least ten (10) categories – Asset-Backed Securities, Commercial Mortgage-Backed Securities, Home Equity, Mortgage-Backed Securities – Aussie, Mortgage-Backed Securities – UK, Mid-Prime Residential Mortgage-Backed Securities, Prime Residential Mortgage-Backed Securities, Business Loans, Student Loans, Sub-prime Residential Mortgage-Backed Securities (*see* ¶73 (chart)). Only the internal version of the portfolio's sectoring accurately reveals the proportion of the Fund's investments in mortgage-related and, specifically, mortgage-backed securities. Furthermore, the internal breakdown by State Street of mortgage-

- 23 -

related and, specifically, mortgage-backed securities demonstrates the extent of the Fund's emphasis and exposure to mortgage-related securities.

77.     As another example, the two charts below reflect the Yield Plus Fund's investment composition, as of the May 31, 2006 time-frame, as disclosed to investors by State Street versus the manner in which the investment composition was recognized internally by State Street:

As Disclosed to Investors
State Street Form N-Q, July 28, 2006
For the period ending May 31, 2006

| Categories | % of Net Assets |
|---|---|
| Asset-Backed Securities | 69.4% |
| International Debt | 15.4% |
| Mortgage-Backed Securities | 13% |
| Short-Term Investments | 3.4% |

As Maintained Internally -
State Street Portfolio Analytic
as of May 31, 2006

| Categories | % of Net Assets |
|---|---|
| Auto | 2.65% |
| Asset-Backed Securities | 2.03% |
| Commercial Mortgage-Backed Securities – Conduit | 1.77% |
| Commercial Mortgage-Backed Securities – Large Loan | .42% |
| Credit Card | 15.09% |
| Mortgage-Backed Securities - Aussie | 6.88% |
| Mortgage-Backed Securities - UK | 16.72% |
| Mid-Prime Residential Mortgage-Backed Securities | 23.69% |
| Prime Residential Mortgage-Backed Securities | 9.87% |
| Business Loans | 1.29% |
| Student Loans | 7.25% |
| Sub-prime Residential Mortgage-Backed Securities | 22.34% |

*Total Mortgage-Backed Securities – 75.5%*
*Total Mortgage-Related Securities – 75.5%*

78.     Based upon State Street's own analytic, 75.5% of the securities held in the Yield Plus Fund portfolio were mortgage-related and, according to their own labeling or sectoring, that same amount of the portfolio was invested in "Mortgage-Backed Securities" (*see, supra*, ¶¶71 and 77 (charts)).  Moreover, according to State Street's internal labeling, 22.34% of the Yield Plus Fund's overall portfolio was invested in sub-prime mortgages (*see, supra*, ¶77 (chart)).

79. The disclosure in the July 28, 2006 Form N-Q that, as of May 31, 2006, the Yield Plus Fund was 13% invested in "Mortgage-Backed Securities" (*see, supra*, ¶¶71 and 77 (charts)) and 69.4% invested in Asset-Backed Securities (*see, supra*, ¶77 (chart)) were inaccurate statements of material fact when made.

80. Each of the Annual Reports, Semi-Annual Reports and Form N-Qs filed during the Class Period contained an inaccurate statement of material fact akin to those described in ¶¶71, 73 and 77.

**The Sectoring or Labeling of Many Securities as
"Asset-Backed Securities" Was False and Misleading**

81. The Schedules of Investments listed individual securities as Asset-Backed Securities.

82. State Street's definition of "Asset-Backed Securities" specifically listed assets such as "auto loans, credit card receivables, leases, installment contracts and personal property," to the exclusion of mortgage-backed or mortgage-related securities.

83. State Street's definition of "Asset-Backed Securities" did not include mortgage-backed or mortgage-related securities.

84. State Street's definition of "Asset-Backed Securities" distinguished between Asset-Backed Securities and Mortgage-Backed Securities: "Like mortgage-backed securities, asset-backed securities are often subject to more rapid repayment than their stated maturity would indicate. . . ."

85. Further, the definition of "Asset-Backed Securities" includes a section titled "Other Risk Associated with Asset-Backed Securities," which likewise excludes mortgage-related investments from the Asset-Backed Securities sector. The section specifically states: "Asset-backed securities present certain additional risks that are not presented by mortgage-backed securities because ***asset-backed securities generally do not have the benefit of a security interest in collateral that is comparable to mortgage assets***." (Emphasis added.)

86.     According to the Registration Statements, "Asset-Backed Securities" do not include mortgage-related or mortgage-backed securities.

87.     Separately, State Street's description of the Yield Plus Fund does not state that investments in asset-backed securities include mortgage-related securities.  To the contrary, the Fund's description treats asset-backed securities and mortgage-related securities as distinct types of investments:

> The Fund attempts to meet its objective by investing primarily in high-quality, dollar-denominated debt instruments, such as ***mortgage related securities***, corporate notes, variable and floating rate notes and ***asset-backed securities***.

(Emphasis added.)   The Fund's description of risk distinguishes between asset-backed securities and mortgage-backed securities as entirely separate risks:

> The Yield Plus Fund is subject to the following risks, as described under "Principal Risks:" ***Asset-backed securities***, call, credit/default, derivatives, dollar-denominated instruments, extension, government securities, income, interest rate, liquidity, management, market, ***mortgage-backed securities***, prepayment and sector.

(Emphasis added.)

88.     Further, the Registration Statements equated mortgage-backed with mortgage-related, as the definition of "Mortgage-Backed Securities" includes a description of "mortgage-related securities" and specifically states that "[t]ypes of mortgage-related securities" include mortgage certificates and that "[m]ortgage certificates are mortgage-backed securities."

89.     Thus, based upon the description of the Fund, mortgage-related and/or mortgage-backed securities would not be listed in the Asset-Backed Securities sector of Yield Plus Fund's Schedule of Investments and any such listing would be an inaccurate and/or misleading statement of material fact.

90.     Still, Defendants included many mortgage-related and mortgage-backed securities in the Asset-Backed Securities sector of the Yield Plus Fund.  Worse, these securities were sectored as

Asset-Backed Securities without disclosure to investors and without any reasonable basis for investors to discern the true nature or extent of the mortgage-related or mortgage-backed investments.

91.     Defendants did not provide investors with sufficient information to decipher which of the securities listed as "Asset-Backed Securities" were mortgage-related or, for that matter, sub-prime mortgage-related.   At the same time, State Street and Defendants internally tracked this information.

92.     The Schedule of Investments disclosed to investors in Annual Reports, Semi-Annual Reports, or Form N-Qs did not identify the type or nature of investment for each particular security. Below is an example of how a security was listed:

> Asset Backed Funding Certificates (Ê)
> Series 2004-HE1 Class M2
> 6.470% due 07/25/34

The Schedule of Investments disclosed only the formal title for each security, along with the security's corresponding series number, class, and maturity date.

93.     Investors were not provided with enough information to adequately determine the nature or type of each security listed in the Schedules of Investments.

94.     The Schedules of Investments in the various Annual Reports, Semi-Annual Reports and Form N-Qs listed numerous mortgage-related or mortgage-backed securities outside of the "Mortgage-Backed Securities" sector.   For many of the securities, an investor could not discern, based upon the title of the security or other disclosed information, that these investments were mortgage-related (*e.g.,* Argent Securities, Inc.; Asset Backed Funding Certificates; Credit-Based Asset Servicing and Securitization; GSAMP Trust; Encore Credit Receivables Trust; and Securitized Asset Backed Receivables LLC Trust).   Even if an investor may have been able to discern that certain of these investments were, conceivably, mortgage-related based upon the title of the security

(*e.g.,* Ameriquest Mortgage Securities, Inc. (Ê), Series 2004-R1 Class M5, 6.520% due 02/25/34), the listing in the Schedules of Investments did not convey the characteristics (including its security interests, if any) or quality of the investment, including, notably, whether it was sub-prime.

95.     Indeed, State Street's own senior money management employee could not determine which securities were mortgage-related based solely on the information disclosed to investors in the Schedules of Investments.

96.     For example, in his deposition taken in the MDL Action, James P. Kramer, the then U.S. Head of Fixed Income Trading at State Street and a former Portfolio Manager at State Street, could not identify whether the securities listed in the various Schedules of Investments were or were not mortgage-related (*e.g.,* Access Group, Inc.; Argent Securities, Inc.). He testified that he did not have the "skill set" to "identify every bond and what the backing of the loans are just by viewing . . . the name of it." He added that in order to determine the nature of the collateral backing of the security, an investor would have to consult an information service for global financial markets.

97.     Secondary sources, coupled with internal State Street documents, demonstrate that a significant portion of the securities classified by State Street as "Asset-Backed Securities" were actually mortgage-related and/or included mortgage-backed securities.

98.     As such, the sectoring of certain mortgage-related securities (*e.g.,* Asset-Backed Funding Certificates; GSAMP Trust; Encore Credit Receivables Trust) as Asset-Backed Securities in the Schedules of Investments were inaccurate and misleading statements of material fact when made.

### The Sectoring or Labeling of Many Securities as "International Debt" Was False and Misleading

99.     International Debt represented a considerable portion of the Yield Plus Fund's portfolio. For example, during the Class Period, the Form N-Qs listed the following percentages of International Debt investments held by the Yield Plus Fund: 18.5% as May 31, 2005; 17.6% as of

November 30, 2005; 15.4% as of May 31, 2006; 23% as of November 30, 2006; 24.8% as of May 31, 2007; and 25.4% as of November 30, 2007.

100.    The Registration Statements did not define "International Debt" nor did they describe the principal risks associated with investments categorized as "International Debt."

101.    Defendants did not provide investors with sufficient information to decipher which of the securities listed as "International Debt" were mortgage-related or, for that matter, sub-prime mortgage-related.

102.    Investors were precluded from adequately or accurately assessing the risk associated with investing in the Yield Plus Fund as they could not reasonably decipher or infer that many securities listed in the International Debt sector of the Yield Plus Fund's Schedule of Investments were, in fact, mortgage-related (including mortgage-backed securities).  Defendants' labeling or sectoring of International Debt in the Fund's Schedule of Investment was, therefore, materially false and misleading.

103.    Secondary sources, coupled with internal State Street documents, demonstrate that a significant portion of the securities classified by State Street as "International Debt" were actually mortgage-related and a substantial portion of the Fund's overall portfolio was invested in sub-prime mortgage securities.  For example:

(a)     as of May 31, 2006, State Street disclosed 97.8% of the Fund's portfolio was invested in Asset-Backed Securities (69.4%), International Debt Securities (15.4%) and Mortgage-Backed Securities (13%).  Contrary to their representations, internal State Street documents establish that, as of May 31, 2006, approximately 65% of the securities categorized in the International Debt sector were mortgage-related securities and, in fact, approximately 23% of the overall Fund was invested in sub-prime mortgage securities;

(b)        as of May 31, 2007, State Street disclosed that 99.2% of the Fund's portfolio was invested in Asset-Backed Securities (60.4%), International Debt Securities (24.8%) and Mortgage-Backed Securities (14%).   Contrary to their representations, internal State Street documents establish that, as of May 31, 2007, approximately 90% of the securities categorized in the International Debt sector were mortgage-related securities and approximately 27% of the entire Fund was invested in sub-prime mortgage securities; and

(c)        more than 50% of the investments listed as "International Debt" in the Form N-Qs filed on July 29, 2005 and January 29, 2007 were mortgage-related; more than 60% as applied to the January 26, 2006 and July 28, 2006 Form N-Qs; nearly 80% as applied to the January 29, 2008 Form N-Q; and nearly 90% as applied to the July 30, 2007 Form N-Q.

104.    Further, certain securities listed in the International Debt sector of the Yield Plus Fund's Schedule of Investments were actually Mortgage-Backed Securities and, therefore, plainly mischaracterized and mislabeled.

105.    For example, the following three securities appear in the "International Debt" sector in every Form N-Q filed during the Class Period: (a) Crusade Global Trust (Ê); (b) Medallion Trust (Ê); and (c) Granite Mortgages PLC (Ê).   Internal State Street portfolio analytics, when combined with secondary research and source materials, identify these securities as Australian or United Kingdom mortgage-related investments.

106.    As a result of Defendants' listing of these securities as International Debt, as opposed to listing them with the Fund's Mortgage-Backed Securities, investors were precluded from adequately or accurately assessing the nature of their investment in the Yield Plus Fund.   The sectoring of certain securities (*e.g.,* Medallion Trust (Ê)) as International Debt were inaccurate statements of material fact and materially misleading.

107.    State Street's internal documents sector the Australian and United Kingdom mortgage securities as "Mortgage-Backed Securities."  The sectoring of these securities as International Debt (*see, supra*, ¶106), in effect, fails to adhere to State Street's own definitions of its Schedule of Investments' sectors.

108.    Defendants' misrepresentation of many mortgage-related or mortgage-backed securities as "International Debt" prevented investors from understanding the true nature of the Yield Plus Fund's investments.  Investors, in effect, could not determine that a significant portion of International Debt securities were mortgage-related and mortgage-backed and that a greater percentage of the Fund was invested in mortgage-related and mortgage-backed securities than what was disclosed in the Registration Statements.

109.    As such, the sectoring of certain mortgage-related securities (*e.g.,* Medallion Trust (Ê); Granite Mortgages PLC (Ê)) as International Debt in the Schedules of Investments were inaccurate and misleading statements of material fact when made.

### The Failure to Sector or Label Certain Securities as "Mortgage-Backed Securities" Was False and Misleading

110.    The Registration Statements define "Mortgage-Backed Securities," in part, as mortgage loans evidenced by promissory notes and secured by "first mortgages," "first deeds of trust" or similar security instruments creating a first lien (*see, supra*, ¶67).  Even if the definition of Mortgage-Backed Securities is read narrowly to be limited to the foregoing (which it should not), the Registration Statements still contained false and misleading representations concerning the Fund's holdings.

111.    The inclusion of mortgage loan investments secured by "first mortgages," "first deeds of trust" or similar security instruments creating a first lien, in a sector/category of the Schedule of Investments other than Mortgage-Backed Securities (*e.g.,* Asset-Backed Securities or International

Debt) is therefore a blatant misrepresentation and would understate the true amount of Mortgage-Backed Securities purportedly in the portfolio.

112.    Labeling an investment secured by a pool of first lien residential mortgages, for example, as an Asset-Backed Security, is patently inconsistent with the foregoing definition of Mortgage-Backed Securities.  The improper labeling would render the disclosed Schedule of Investments false and misleading.

113.    Secondary research and source materials reveal that Defendants improperly sectored/categorized numerous investments rooted in first liens or first mortgages as Asset-Backed Securities.

114.    For example, the July 30, 2007 Form N-Q discloses that, as of May 31, 2007, the Yield Plus Fund held forty-one (41) investments that Defendants labeled Asset-Backed Securities. Defendants did not disclose, however, that thirty-four (34) of those investments had mortgage-related and/or mortgage-backed components.  Defendants also did not disclose that twenty-eight (28) of those securities contained at least some first lien mortgages and that thirteen (13) of those mortgage loan investments were reportedly secured only by first mortgages or first liens.

115.    Defendants misrepresented the thirteen (13) investments described in ¶73 as Asset-Backed Securities when, under the descriptions and disclosures provided to investors of the Yield Plus Fund, the thirteen (13) investments should unquestionably have been listed under the Mortgage-Backed Securities sector.  Had Defendants properly categorized these securities, the Fund would have reported, at minimum, 34% Mortgage-Backed Securities as of May 31, 2007, instead of the 14% actually reported.  This number, however, still significantly understates the Mortgage-Backed Securities in the overall portfolio due to, among other things, the fifteen (15) or more additional securities that contain some first lien mortgage component.  The real percentage of Mortgage-

Backed Securities was in all likelihood at or near the 86% internally reported by Defendants (*see, supra*, ¶¶73-74).

116.    Similar misrepresentations were made by Defendants in each of the Annual Reports, Semi-Annual Reports and Form N-Qs filed during the Class Period.

117.    As a result of these misrepresentations, investors could not determine the true makeup of the Yield Plus Fund's portfolio. And, in effect, investors could not determine what percentage of the Fund was actually invested in Mortgage-Backed Securities versus the incorrect percentage provided to them in the Schedule of Investments.

118.    Therefore, the Schedules of Investments that listed mortgage-related securities in sectors other than "Mortgage-Backed Securities" – in the Annual Reports, Semi-Annual Reports and Form N-Qs filed during the Class Period – contained misrepresentations and were inaccurate statements of material fact when made.

### The Stated Objective of the Yield Plus Fund Was False and Misleading

*"Diversified Portfolio"*

119.    The Registration Statements stated that the Yield Plus Fund's investment objective would be met by investing in a "diversified portfolio" of debt securities (*see, supra*, ¶¶61 and 63).

120.    As alleged herein, however, the Yield Plus Fund did not have a diversified portfolio during the Class Period (*see, supra*, ¶¶71, 73 and 73 (charts), *and generally*, 71-118). Instead, it was heavily-weighted with investments in risky mortgage-related and/or mortgage-backed securities, including a significant percentage of investments in sub-prime mortgages.

121.    Defendants' disclosures that Mortgage-Backed Securities comprised approximately 13% to 20% of the Yield Plus Fund's portfolio over the course of the Class Period were inaccurate statements of material fact when made. Because, in reality, Mortgage-Backed Securities comprised

approximately 40% to more than 85% of the Yield Plus Fund's portfolio over the course of the Class Period.

122.     Furthermore, according to internal State Street analytics, as much as 28.05% of the Yield Plus Fund was invested in sub-prime mortgage products.

123.     The description of the Yield Plus Fund as having a "diversified portfolio" was an inaccurate statement of material fact and materially misleading.

124.     The use of the term "diversified portfolio" to describe the Yield Plus Fund concealed the true risk of the Fund, which, when the risk of the undiversified nature of the Fund materialized, caused (or exacerbated) the losses to Plaintiff's and other Class members' investment in the Fund.

125.     Defendants not only failed to follow the Fund's objective criteria of investing in a diversified portfolio of securities, Defendants' use of sector names – Asset-Backed Securities, Corporate Bonds and Notes, International Debt and Mortgage-Backed Securities – were inaccurate statements of material fact when made because the Fund did not have a diversified portfolio.  As opposed to spreading the risks, as disclosed, among investments secured by auto loans, credit card receivables, leases, installment contracts, personal property, mortgages, corporate notes, etc., the Yield Plus Fund increasingly saturated its investments in mortgage-related and/or mortgage-backed securities until those investments constituted a substantial majority of the Fund.

*"Liquidity"*

126.     The Registration Statements stated that the Yield Plus Fund's investment objective included seeking high current income and "liquidity" (*see, supra*, ¶¶60 and 63).

127.     As alleged herein, however, throughout the Class Period, the Yield Plus Fund became increasingly invested in mortgage-related and/or mortgage-backed securities, including significant investments in sub-prime mortgages, all which encompass a great risk of becoming illiquid, resulting

in investor losses (*see, supra*, ¶¶71, 73 and 73 (charts), *and generally*, ¶¶71-118). Accordingly, by increasing the Fund's exposure to these types of securities in pursuit of higher returns, Defendants abandoned the Fund's stated objective of seeking "liquidity" along with "high current income."

128.    Based upon internal State Street documents and deposition testimony provided in the MDL Action, executives of State Street acknowledged that by no later than the summer of 2007, liquidity risk had become a "material risk" for the portfolios and that even the AA rated mortgage-related securities were "very illiquid."

129.    On November 20, 2007, *The Kiplinger Washington Editors* reported that the Yield Plus Fund was invested in a sizeable number of illiquid securities. Citing a source with the Fund, the November 20 article stated: "The fund reports it was 'impacted' by problems with subprime mortgages and suffered when other investors sold the same kind of securities Yield Plus [Fund] held, 'resulting in severe illiquidity.'"

130.    Yet, it was not until December 2007 that Defendants disclosed that, due to its extreme concentration in mortgage-related and/or mortgage-backed securities, the Yield Plus Fund's risks included "liquidity risks." Defendants further, for the first time, added asset-backed securities and mortgage-backed securities to the list of investments subject to liquidity risk:

> **Liquidity Risk.** Certain types of securities, such as non-investment grade debt securities, small capitalization stocks, securities issued by real estate investment trusts, emerging market securities, ***asset-backed securities and mortgage-backed securities***, are subject to the risk that the securities may not be sold at the quoted market price within a reasonable period of time. A Fund holding such securities may experience substantial losses if required to liquidate these holdings.

131.    In addition, through its concentration in mortgage-related and/or mortgage-backed securities, much of the Fund's asset base had little price transparency and, therefore, little liquidity. According to an FDIC Supervisory Insights published in December 2007, *Enhancing Transparency in The Structured Finance Market*:

In contrast to corporate bonds, securitizations consist of various pooled securities, including MBS and CDOs, that often have no track record and that require an in-depth modeling and understanding of a highly segmented amount of assets that comprise the collateral pool. For this reason, a lack of complete and public dissemination of a securitization's loan-level data reduces transparency and hampers the investor's ability to fully assess risk and assign value.

*       *       *

Market participants attribute [the lack of price transparency] . . . to the lack of an established secondary market for these securities as most ABS and CDO investors follow a buy-and-hold strategy, with trades executed bilaterally between the investor and the dealer bank. As a result, for many product types, actual trade prices generally are not reported in organized or centralized fashion, although market participants indicate that the dealer banks have access to this information.

132.    The description of the Yield Plus Fund's investment objective as including seeking high current income and "liquidity" was an inaccurate statement of material fact and materially misleading.

133.    Therefore, the Yield Plus Fund's stated objective of maintaining liquidity, or investing in liquid securities, concealed the true risk of the Fund, which, when the risk of the illiquid nature of the Fund materialized, caused (or exacerbated) the losses to Plaintiff's and other Class members' investment in the Fund.

**"High Quality"**

134.    The Registration Statements stated that the Yield Plus Fund's investment objective would be met by investing in "high quality" debt securities (*see, supra*, ¶¶62 and 63).

135.    As alleged herein, however, throughout the Class Period, the Yield Plus Fund became increasingly concentrate in mortgage-related and/or mortgage-backed securities, including significant investments in sub-prime mortgages, which was widely recognized as risky and unsecure.

136.    Management, including portfolio managers, at State Street were aware of the market perception that mortgage-related and/or mortgage-backed securities were a risky investment during the Class Period.  Members of State Street's management were also presented with and exchanged

information and opinions, no later than early 2007, which discussed the increased risk in mortgage-related and/or mortgage-backed securities and the imminent threat of a complete meltdown of the industry.

137.    As acknowledged in deposition testimony provided in the MDL Action, by no later than the summer of 2007, management at State Street were aware that the ratings associated with mortgage-related securities were not indicative of their quality and that there was information to lead one to question the ratings on those securities.

138.    Notwithstanding any external factors utilized to justify the "high quality" characteristic of the securities held by the Yield Plus Fund (*e.g.*, rating agencies), management at State Street were in possession of information showing that these investments were deteriorating, unstable, and generally risky (*see*, *supra*, ¶¶43-59).  Further, because not all "AAA" rated debt securities are of equal soundness, for example, management could not rely solely on a bond's rating to judge its soundness and had to rely on other factors (*e.g.*, quoted yield) to judge the securities' risk, stability and overall quality.

139.    The description of the securities held by the Yield Plus Fund as "high quality" was an inaccurate statement of material fact and materially misleading.

140.    As a result, the description of the Fund's investment in "high quality" securities concealed the true investment objective of the Fund, as well as the risk of investing in the Fund, which, when the risk of the low or diminished quality of securities held by the Fund materialized, caused (or exacerbated) the losses to Plaintiff's and other Class members' investment in the Fund.

**The Registration Statements Misrepresented the Value of the Fund**

141.    The Yield Plus Fund determined the price per share twice each business day as of 12 noon Eastern time and as of the close of the regular trading session of the New York Stock Exchange (ordinarily 4 p.m. Eastern time).  The price of Fund shares or the Net Asset Value (the

"NAV") was computed by dividing the current represented value of the Fund's assets (less liabilities) by the number of shares of the Fund outstanding and rounding to the nearest cent.

142.    The Registration Statements reported inflated values for the Fund's risky mortgage-related securities.  The inflation of the value of the Fund's portfolio in the Registration Statements resulted in an inflation of the Fund's NAV during the Class Period as a result of the Fund's failure to properly value and write-down these risky assets.

143.    Furthermore, the Registration Statements stated that the securities in the Fund were valued according to board-approved Securities Valuation Procedures, including Market Value Procedures, Fair Value Procedures and Pricing Services.  Many of the securities held by the Yield Plus Fund did not trade frequently or have prices that were readily available.  According to the Registration Statements, if market quotations were not readily available for a security or if subsequent events suggest that a market quotation is not reliable, the SSgA Funds will use the "security's fair value," as determined in accordance with Fair Value Procedures.

144.    The statement referenced above in ¶143 that State Street would use the "security's fair value" was an inaccurate statement of material fact because the Fund did not use the "security's fair value" but instead was unable to or otherwise failed to properly value the securities as represented and reported inflated values for mortgage-related investments, which failed to take into account prevailing economic conditions.

145.    Each member of the Class that purchased shares of the Yield Plus Fund purchased those shares pursuant to the Registration Statements.  The NAVs that were paid by each Class Member were inflated when purchased because the Yield Plus Fund failed to properly value the securities as represented and failed to timely write-down the troubled assets in its portfolio, including the mortgage-backed securities.

**Misrepresentations in the Certifications**

146.     Semi-annually, throughout the Class Period, the Fund issued Certified Reports to Shareholders of the Fund.  Each report discussed the performance of the Fund and its holdings.

147.     Attached to each report was a certification by Defendants Ross and Swanson, certifying:

> 2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, changes in net assets, and cash flows (if the financial statements are required to include a statement of cash flows) of the Registrant as of, and for, the periods presented in this report;

> 4.     The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) and internal control over financial reporting (as defined in Rule 30a-3(d) under the Investment Company Act of 1940) for the Registrant and have:

>> (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

>> (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

>> (c)     Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of a date within 90 days prior to the filing date of this report based on such evaluation; and

       (d)     Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the second quarter of the period covered by this report that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.     The Registrant's other certifying officer and I have disclosed to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

       (a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize, and report financial information; and

       (b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

148.    The statements referenced above in ¶147 were each an untrue statement of material fact for the reasons set forth above in ¶¶72, 75, 79-80, 89, 98, 102, 106, 109, 118, 123, 132, 139 and144.

## The Yield Plus Fund Loses Value and Is Liquidated

149.    Beginning in late 2007 and accelerating through the first quarter of 2008, and continuing throughout 2008, the Fund took massive write-downs as it belatedly marked the value of mortgage-related investments down to their reduced market values.  Those write-downs caused a commensurate decline in the Fund's NAV, which in turn resulted in losses and caused investors to abandon the Fund.

150.    The Fund's NAV plummeted from a relatively stable price of approximately $9.96 per share at the beginning of the Class Period to $6.60 per share on May 21, 2008, or a loss of almost 34% since July 1, 2005.  During June and early July 2007, the Fund's NAV was $9.91 per share.  Then, Defendants slowly began lowering the NAV for the Fund.  By August 7, 2007, the Fund's

NAV was reduced to $9.30; by August 20, 2007 to $9.01; by December 12, 2007 to $8.02; by March 3, 2008 to $7.46; and by May 2, 2008 to $6.62.

151.    The Yield Plus Fund fell 7.6% during the three months ended August 31, 2007 and fell 13.36% during 2007.  The below chart depicts the sudden drop of the NAV of the Fund after a long period of stability:



152.    An August 29, 2007 article in the *Wall Street Journal* titled "Credit Crunch: State Street Is Exposed To Conduit-Backed Assets – Vehicles Have Caused Headaches in Europe; Bond Fund Loses Value," stated, in pertinent part, as follows:

> A State Street mutual fund sold to individual investors, SSgA Yield Plus fund, is down 7.6% in the last three months, according to mutual-fund watcher Morningstar Inc.  Other ultra-short funds run by other fund companies are also down, but only by about 1%, because they put only small portions in asset-backed and mortgage securities, said Lawrence Jones, an analyst for Morningstar.  Mr. Jones said the drop "raises questions" about State Street's "credit research process . . . they underestimated the risk of these asset-backed securities."

153.    An October 5, 2007 article in *Bloomberg* reported Jeff Tjornehoj, an analyst at fund-research firm Lipper Inc., as stating the following concerning SSgA's investments in mortgage-related assets for its funds: "When you're investing in an investment-grade debt fund, you are expecting some level of preservation of capital . . . Some funds have held certain subprime issues, and for their intrepid adventures, investors have suffered terribly."

154.    In an email dated October 2, 2007, Arlene Roberts, a State Street spokeswoman, said portfolios "with over-weights in residential mortgage-backed securities, representing various risk/return profiles, have been impacted negatively by the recent market conditions."

155.    During the fourth quarter of 2007, State Street set aside $625 million to cover legal claims arising out of its inappropriate investments in mortgage-related securities, such as the investments by the Fund.

156.    On February 14, 2008, State Street announced that it appointed six senior executives to help oversee global fixed income following losses tied to sub-prime mortgage securities, including losses suffered in the Fund.

157.    On April 8, 2008, the Board of Trustees of the Yield Plus Fund ratified a plan to cease the public offering of its shares and any business activities, except for the purpose of preparing to wind up, and winding up, its business and affairs, including the liquidation of the Yield Plus Fund.

158.    On May 30, 2008, the Yield Plus Fund was liquidated.

159.    On October 15, 2008, State Street announced that it may set aside up to $450 million to absorb losses for investors whose funds were negatively impacted in connection with losses to mortgage and credit related securities.  These funds were in addition to the reserve set up by State Street during the fourth quarter of 2007.

160.    On January 20, 2009, State Street announced that it took a $450 million charge in the fourth quarter of 2007 for the cost of protecting investors in its so-called "stable value accounts" managed by its SSgA unit as a result of problems with risky investments, including mortgage-related securities.

161.    On November 6, 2009, State Street announced that it added $250 million to the reserve it established in 2007.

162.    State Street has since announced settlements with a purported class action of ERISA participants in the active fixed-income strategies ($89.75 million) and with the SEC in connection with the government's investigation concerning certain active fixed-income strategies managed by SSgA ($313 million fair fund).

163.    These settlements did not compensate Plaintiff or the Class members he seeks to represent in connection with their purchases of shares of the Yield Plus Fund.

## COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants

164.    Plaintiff repeats and realleges each and every allegation contained above.

165.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

166.    The Registration Statements were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

167.    SSgA Funds is the registrant for the shares of the Fund, and as such is strictly liable for the false statements contained in the Registration Statements. The Defendants named herein were responsible for the contents and dissemination of the Registration Statements.

168.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

169.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

170.    Plaintiff acquired shares of the Fund during the Class Period and pursuant to the Registration Statements.

171.    Plaintiff and the Class have sustained damages.  The value of the shares of the Fund declined substantially subsequent to and due to Defendants' violations.

172.    At the times they purchased shares of the Fund, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year had elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time of filing of the initial complaint in this action.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time of the filing of the initial complaint.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

173.    Plaintiff repeats and realleges each and every allegation contained above.

174.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all Defendants.

175.    Defendants were sellers and offerors and/or solicitors of purchasers of the shares of the Yield Plus Fund offered pursuant to the Registration Statements, Prospectuses and other documents incorporated therein.

- 44 -

176.    The Registration Statements contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.  The Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Registration Statements and participating in marketing the shares of the Fund to investors.

177.    Defendants owed to the purchasers of the shares of the Fund, including Plaintiff and other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements and corresponding amendments to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants in the exercise of reasonable care should have known of the misstatements and omissions contained in the offering materials as set forth above.

178.    Plaintiff and other members of the Class purchased or otherwise acquired shares of the Fund pursuant to the defective Registration Statements.  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in Defendants' solicitation materials.

179.    By reason of the conduct alleged herein, Defendants violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Class who hold shares of the Fund have the right to rescind and recover the consideration paid for their shares of the Yield Plus Fund and hereby elect to rescind and tender those shares to the Defendants sued herein.  Plaintiff and Class members who have sold their shares of the Fund are entitled to rescissory damages.

## COUNT III

### Violations of Section 15 of the Securities Act
### Against the Individual Defendants

180.    Plaintiff repeats and realleges each and every allegation contained above.

181.    This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

182.    Each of the Individual Defendants was a control person of the Fund by virtue of his or her position as a director, trustee and/or senior officer of Fund or other Defendant companies.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other trustees, directors and/or officers and/or major shareholders of the Fund.

183.    Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statements and having otherwise participated in the process which allowed the sale of the shares of the Fund to be successfully completed.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages as to Count II; and

E.      Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  July 28, 2010

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
MARK S. REICH

_____
                    EVAN J. KAUFMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
mreich@rgrdlaw.com

DYER & BERENS LLP
ROBERT J. DYER III
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, CO  80203
Telephone: 303/861-1764
303/395-0393 (fax)
bob@dyerberens.com
jeff@dyerberens.com

*Co-Lead Counsel for Plaintiff*

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
200 Ashford Center North - Suite 300
Atlanta, Georgia 30338
Telephone:  770/392-0090
770/392-0029 (fax)

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Evan J. Kaufman hereby certify that on July 28, 2010, I caused a true and correct copy of the attached:

Second Amended Class Action Complaint

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to all counsel on the attached service list.

EVAN J. KAUFMAN

STATE STREET YIELD PLUS
(LEAD)
Service List - 7/28/2010   (08-0132)
Page 1 of 1
**Counsel For Defendant(s)**

John D. Donovan, Jr.
Harvey J. Wolkoff
Robert A. Skinner
Ropes & Gray LLP
One International Place
Boston, MA  02110-2624
  617/951-7000
  617/951-7050(Fax)

Thomas J. Dougherty
Peter  Simshauser
Michael S. Hines
Skadden, Arps, Slate, Meagher & Flom LLP
One Beacon Street
Boston, MA  02108
  617/573-4800
  617/573-4822(Fax)

**Counsel For Plaintiff(s)**

Robert J. Dyer III
Jeffrey A. Berens
Dyer & Berens LLP
303 East 17th Street, Suite 300
Denver, CO  80203
  303/861-1764
  303/395-0393(Fax)

Corey D. Holzer
Michael I. Fistel, Jr.
Holzer Holzer & Fistel, LLC
200 Ashford Center North, Suite 300
Atlanta, GA  30338
  770/392-0090
  770/392-0029(Fax)

Samuel H. Rudman
Evan J. Kaufman
Mark S. Reich
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY  11747
  631/367-7100
  631/367-1173(Fax)