UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE STATE STREET BANK AND TRUST
CO. FIXED INCOME FUNDS INVESTMENT
LITIGATION

MDL No. 1945

---

NING YU, On Behalf of Himself and All Others
Similarly Situated,

       Plaintiff,
  -against-

STATE STREET CORPORATION, et al.,

       Defendants.

08 Civ. 8235 (RJH)

**MEMORANDUM OPINION
AND ORDER**

---

Richard J. Holwell, District Judge:

  This is the Court's third opinion regarding the sufficiency of plaintiff's pleadings in this action, which asserts claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933. Previously, the Court dismissed the action with prejudice, holding that it failed to plead adequately the existence of materially false or misleading statements. *Yu v. State Street Corp.* ("*Yu I*"), 686 F. Supp. 2d 369 (S.D.N.Y. 2010). The Court later reconsidered the "with prejudice" aspect of its decision, found that the Proposed Second Amended Complaint ("PSAC") adequately pled the existence of at least some materially false or misleading statements, and granted plaintiff leave to amend. *Yu v. State Street Corp.* ("*Yu II*"), No. 08 Civ. 8235 (RJH), 2010 WL 2816259 (S.D.N.Y. July 14, 2010). Now before the Court are defendants' motions to

1

dismiss the Second Amended Complaint ("SAC").  For the reasons that follow, defendants' motions to dismiss are GRANTED.

## BACKGROUND

The Court presumes familiarity with its earlier two opinions, and recounts only the factual background necessary for this opinion.  All terms defined in the previous opinions retain the same meaning here.

The SAC alleges that several statements in the Fund's offering documents "misrepresented the nature of the securities or investments held by the Yield Plus Fund . . . , misrepresented the description and/or objectives of the Fund and misrepresented the Fund's exposure to risky mortgage-related assets and the risk of investing in the Fund."  (SAC ¶ 70.)  Two sets of allegations have already been addressed by the Court.

First, the SAC alleges a discrepancy between the publicly-disclosed percentages of mortgage-backed securities held by the Fund and internally-circulated percentages.  (*See* SAC ¶ 70-118.)  In *Yu II*, the Court held that the SAC "states a plausible claim that the percentage tables mis-categorized securities and were materially misleading."  2010 WL 2816259, at *3 (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010)).

Second, the SAC alleges that the Fund overstated the value of its holdings by reporting "inflated values for the Fund's risky mortgage-related securities." (*See* SAC ¶¶ 141-145.)  The Court previously dismissed this claim in *Yu I* and found on reconsideration that the SAC "does not contain amendments that address the shortcomings identified in [*Yu I*]."  *Yu II*, 2010 WL 2816259, at *4 n.4; *see Yu I*, 686 F. Supp. 2d at 379-81.

Third, the SAC makes allegations concerning the investment objective in the Fund's offering documents.[1] In particular, the SAC's allegations address three particular phrases. First, the SAC alleges that the prospectus's statement that the Fund would meet its objective by investing in a "diversified portfolio" is materially misleading. (SAC ¶ 119.) This is allegedly misleading because the Fund was "heavily-weighted with investments in risky mortgage-related and/or mortgage-backed securities, including a significant percentage of investments in sub-prime mortgages." (*Id.* ¶ 120.) According to the SAC, mortgage-backed securities constituted "approximately 40% to more than 85%" of the Fund's portfolio, and "as much as 28.05%" of the Fund was invested in subprime mortgage products. (*Id.* ¶¶ 121-122.) Instead of "spreading the risks . . . among investments secured by auto loans, credit card receivables, leases, installment

---

[1] The full statement of the Fund's objective is as follows:

> **Yield Plus Fund.** The nonfundamental investment objective is to seek high current income and liquidity by investing primarily in a diversified portfolio of high-quality debt securities and by maintaining a portfolio duration of one year or less.
>
> The Fund attempts to meet its objective by investing primarily in high-quality, dollar-denominated, investment grade debt instruments, such as mortgage related securities, corporate notes, variable and floating rate notes and asset-backed securities. The Fund may also invest in derivative securities, including interest rate swaps, credit default swaps, total return swaps, interest rate caps, floors and collars, futures, options, and other structured securities. Unlike a money market fund, the price of the Yield Plus Fund will fluctuate because the Fund may invest in securities with higher levels of risk and different maturities. The Fund will actively trade to benefit from short-term yield disparities among different issues of fixed-income securities, or otherwise to increase income.
>
> The Yield Plus Fund considers the following instruments or investment strategies to be principal to the achievement of its investment objective. Please see "Additional Information about the Funds' Investment Policies and Risks" in this Prospectus: Variable and floating rate securities; asset-backed securities; cash sweep; investment grade securities; securities lending; mortgage-backed securities; US government securities; futures contracts and options on futures; interest rate swaps, credit default swaps, total return swaps, and interest rate caps, floors and collars; Eurodollar certificates of deposit, Eurodollar time deposits, and Yankee certificates of deposit; Section 4(2) commercial paper, repurchase agreements; portfolio duration; and options on securities and securities indexes.
>
> The Yield Plus Fund is subject to the following risks, as described under "Principal Risks:" Asset-backed securities, call, credit/default, derivatives, dollar-denominated instruments of foreign banks and corporations, extension, government securities, income, interest rate, management, market, mortgage-backed securities, prepayment and sector.

(Skinner Decl. Ex. A ("Prospectus") at 4-5.)

contracts, personal property, mortgages, corporate notes, etc., the Yield Plus Fund increasingly saturated its investments in mortgage-related and/or mortgage-backed securities until those investments constituted a substantial majority of the Fund." (*Id.* ¶ 125.)

Second, the SAC alleges that the prospectus's statement that the Fund sought "liquidity" was materially misleading. Because the Fund became "increasingly invested in mortgage-related and/or mortgage-backed securities . . . all which encompass a great risk of becoming illiquid," the SAC alleges that "Defendants abandoned the Fund's stated objective of seeking 'liquidity.'" (*Id.* ¶ 127.) According to the SAC, State Street executives were aware no later than the summer of 2007 that "even the AA rated mortgage-related securities were 'very illiquid.'" (*Id.* ¶ 128.) Nevertheless, State Street did not disclose that the Fund's risks included liquidity risk until December 2007. (*Id.* ¶ 130.) Furthermore, the SAC alleges that "through its concentration in mortgage-related and/or mortgage-backed securities, much of the Fund's asset base had little price transparency and, therefore, little liquidity." (*Id.* ¶ 131.)

Third, the SAC alleges that the prospectus's statement that it would meet its objective by investing in "high quality" debt securities was materially misleading because of the Fund's increasing concentration in mortgage-related and mortgage-backed securities, including those related to sub-prime mortgages, over the Class Period.[2] The SAC further alleges that State Street management was aware of the increased risk associated with mortgage-related securities in early 2007 and that by the summer of 2007, State Street management was aware that the credit ratings associated with mortgage-related securities were not indicative of their actual quality. (*Id.* ¶¶ 136-138.)

---

[2] The SAC defines the Class Period as the time between July 1, 2005 and June 30, 2008. (SAC ¶ 1.)

4

State Street now brings its motion to dismiss these claims, arguing again that the SAC fails to plead falsity and materiality.[3] State Street also renews three arguments contained in its previous motion to dismiss: (1) the certifications signed by defendants James Ross and Mark E. Swanson and attached to the Fund's periodic reports did not contain any untrue statements of material fact; (2) plaintiff's Section 12(a)(2) claims must be dismissed as against the State Street Defendants and Individual Defendants Peter G. Leahy, Ross, and Swanson because these parties are not "sellers" of the Fund; and (3) the "control person" claims under Section 15 must be dismissed.  (State Street's Mem. at 9 n.9.)  State Street further argues that the alleged losses are not causally connected to the misstatements or omissions alleged here.  The Court concludes below that this last contention, that plaintiffs have not alleged loss causation, warrants dismissal of the SAC.  Accordingly, the Court finds it unnecessary to consider defendants' alternate grounds for dismissal.

## DISCUSSION

### I. Standard for a Motion To Dismiss

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 321 (2d Cir. 2010) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

---

[3] In *Yu II*, the Court directed the parties not to "re-argue issues that have already been decided, *e.g.*, the sufficiency of the PSAC's allegations concerning the percentage tables." 2010 WL 2816259, at *4.  State Street, in its brief, nevertheless seized upon this opportunity to re-argue the falsity and materiality of its statements regarding the Fund's exposure to mortgage-related securities.  (Def.'s Mem. at 18-22).  State Street acknowledges that "the Court directed the parties not to re-brief issues that the Court therein decided," but nevertheless "respectfully moves the Court to reconsider its July Opinion."  (Def.'s Mem. at 18 n.11.)  State Street filed its motion on August 27, 2010.  As such, even if a motion to reconsider the Court's July 14, 2010 opinion were proper given the Court's explicit instruction and *Yu II*'s nature as a motion for reconsideration, State Street's motion is untimely.  *See* Local Civil Rule 6.3 ("[A] notice of motion for reconsideration or reargument of a court order determining a motion shall be served within fourteen (14) days after the entry of the court's determination of the original motion . . . .").  Accordingly, the Court declines to reconsider argument as to the whether falsity and materiality have been adequately pled with respect to the percentage tables in the Fund's offering documents.

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  If the factual averments permit no reasonable inference stronger than the "mere possibility of misconduct," the complaint should be dismissed. *Starr*, 592 F.3d at 321 (*quoting Iqbal*, 129 S. Ct. at 1950).  In applying this standard of facial plausibility, the Court accepts all factual allegations as true, but it does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action."  *Iqbal*, 129 S. Ct. at 1949.  On a motion to dismiss, the Court may properly consider documents referenced in or integral to the complaint, as well as public filings with the Securities and Exchange Commission ("SEC").  *In re IAC/Interactivecorp*, 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007).

## II. Standards for Loss Causation

"[P]laintiffs bringing claims under sections 11 and 12(a)(2) need not allege . . . loss causation," *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359, but "[s]ection 11(e) makes the absence of loss causation an affirmative defense."  *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 743 F. Supp. 2d 288, 291 (S.D.N.Y. 2010).  Section 11(e) provides:

> [I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.

15 U.S.C. § 77k(e).  Section 12(b) is similar, and provides:

> In an action described in subsection (a)(2) of this section, if the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) of this section represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication, with respect to which the liability of that person is asserted, not being true or omitting to state a material fact required to be

6

>stated therein or necessary to make the statement not misleading, then such portion or amount, as the case may be, shall not be recoverable.

*See* 15 U.S.C. § 77*l*(b). The complaint, therefore, may be dismissed if a defendant can prove that it is apparent on the face of the complaint that the alleged loss is not causally connected to the misrepresentations at issue. *See Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir. 1998) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint.").

### III. Loss Causation

Two cases frame the loss causation inquiry here. In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), certain individuals bought stock in Dura Pharmaceuticals ("Dura") on the public securities market. 544 U.S. at 339. These individuals brought suit under Section 10(b) of the Securities Exchange Act of 1934 alleging, *inter alia*, that Dura made false statements about the FDA's approval of an asthmatic spray device. *Id.* Dura later announced that its earnings would be lower than expected, and its shares lost almost half their value the next day. *Id.* Eight months later, Dura announced that the FDA would not approve the asthmatic spray device, but this announcement did not result in an overall change in Dura's share price. *Id.* The Ninth Circuit ruled that plaintiffs had adequately pled loss causation because they had alleged that "the price *on the date of purchase* was inflated because of the misrepresentation." *Id.* at 342 (emphasis in original).

The Supreme Court rejected the Ninth Circuit's test, noting first that "as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss." *Id.* The Court added that "the most logic alone permits us to say is that the higher purchase price will *sometimes* play a role in bringing about a future loss." *Id.* at 343 (emphasis in original). Noting

7

that "[j]udicially implied private securities fraud actions resemble in many (but not all) respects common-law deceit and misrepresentation actions," the Court cited the Restatement of Torts, which "in setting forth the judicial consensus, says that a person who 'misrepresents the financial condition of a corporation in order to sell its stock' becomes liable to a relying purchaser 'for the loss' the purchaser sustains 'when the facts . . . become generally known' and 'as a result' share value 'depreciates.'" *Id.* at 333-34 (citing Restatement (Second) of Torts § 548A, cmt. b). The Court found that although securities statutes maintain public confidence in the marketplace through the availability of private securities actions, "the statutes make these . . . actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Id.* at 345. *Dura*, therefore, emphasized what is known as a "corrective disclosure-price drop" paradigm in its discussion of loss causation in securities fraud actions.

The Second Circuit also examined loss causation in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005). There, plaintiffs alleged that Merrill Lynch had issued false and misleading reports recommending that investors purchase shares of certain Internet companies, even though Merrill Lynch analysts did not actually believe that they were good investments. *Id.* at 164. The court began its loss-causation analysis by noting that "it is long settled that a securities-fraud plaintiff 'must prove both transaction and loss causation.'" *Id.* at 172 (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)). Transaction causation "requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" *Id.* (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).

8

As for loss causation, like the *Dura* court, the *Lentell* court analogized it to "the tort-law concept of proximate cause," although it noted that "the tort analogy is imperfect" since in tort law, the inquiries of foreseeability and proximate cause are typically the same.[4] *Id.* at 172-73. With securities, however, "it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated." *Id.* As this Court has said before, the *Lentell* court explained with this language that "the key difference" between proximate cause in tort and loss causation in securities fraud is that in the latter, "stock prices decline in reaction to information released into the market rather than in reaction to the fraudulent statements themselves." *In re Vivendi, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 363 (S.D.N.Y. 2009). Because of this difference, *Lentell* requires two conditions to be satisfied for loss causation: first, that "the loss be foreseeable" and second, "that the loss be caused by the materialization of the concealed risk." *Lentell*, 396 F.3d at 173. The foreseeability inquiry depends on whether "the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Id.* (emphasis in original). When evaluating the latter prong, a court inquires into whether "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* (emphasis in original) (internal citation omitted). *Lentell* recognized that the "corrective disclosure-price drop" scenario was not the only method by which loss causation could be proven; as long as the

---

[4] Although *Lentell* and *Dura* address loss causation in the context of section 10(b) and Rule 10b-5 claims, courts have employed the reasoning of those cases to analyze loss causation in Section 11 claims. *See, e.g.*, *Amorosa v. AOL Time Warner, Inc.*, 2011 WL 310316, at *2-3 (2d Cir. Feb. 2, 2011) (applying *Lentell* to analyze loss causation in a Section 11 claim); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005) (noting that "the negative causation defense in Section 11 and the loss causation element in Section 10(b) are mirror images" and applying *Lentell*).

fraudulent statement or omission concealed something from the market, and disclosure, whether by the company or by some other means, caused a drop in the security's price, loss causation would be present.

Both *Lentell* and *Dura*, however, articulate that the disclosure of the facts hidden by the material misstatement, whether by a "corrective disclosure" theory or by a "materialization of the risk" theory, must negatively affect the value of the security. State Street argues that this focus in *Lentell* and *Dura* compels a conclusion that no possible loss causation exists on the face of the complaint. The argument is as follows: the price of mutual fund shares is not determined by market securities trading, but on a fund's net asset value ("NAV").[5] The NAV is a statutorily defined formula that depends on the value of underlying securities. *See* 15 U.S.C. § 80a-2(a)(41); 17 C.F.R. §§ 270.2a-4, 270.22c-1. Because the NAV is so determined, "alleged misrepresentations regarding a fund's investment objective and holdings—rather than the inputs into the NAV calculation—can have no effect on a fund's share price." (State Street Mem. at 25.) Here, "the NAV declines that caused Plaintiff's losses . . . were due to the decline in the value of the Fund's underlying investments, irrespective of what was disclosed about . . . those securities." (*Id.*) Accordingly, "the plain fact is that the bonds held in the Fund's portfolio would have experienced the same market value losses, causing the same depreciation in the Fund's NAV." (*Id.* at 26.) Any loss suffered by plaintiff, therefore, is not the result of disclosure of hidden facts, but of a declining economy.

Under this theory, what State Street said regarding the composition of its portfolio is simply irrelevant to loss causation. The NAV was not artificially inflated by anything State Street said in its prospectus—it accurately reflected the value of the investments it held at any

---

[5] As the Court explained in *Yu I*, "The Fund's share price, called the Net Asset Value ('NAV'), depended on the value of its portfolio. NAV was calculated twice daily according to the following formula: (Assets-Liabilities)/Number of Shares." 686 F. Supp. 2d at 372.

given time. Therefore, no "materialization of the risk" hidden by the prospectus could cause a decline in the NAV, since the NAV was never inflated by statements in the prospectus. Although a false statement about the composition of the Fund in the prospectus might have induced a plaintiff into purchasing shares of the Fund, that proves only transaction causation, not loss causation. Both are required under *Lentell* to maintain the claims here.

Not surprisingly, plaintiff has a different theory of the case. Under plaintiff's theory, the "risk" hidden by the prospectus's statements was that inherent in a non-diversified portfolio— that a certain sector of the economy would collapse and that the Fund's overexposure to that sector would render it overly vulnerable to that collapse. That risk "materialized when defendants wrote down the market value of the Funds' mortgage-related investments, causing 'a commensurate decline in the Fund[s'] NAV, which in turn resulted in losses and caused investors to abandon the Fund." (Pl.'s Opp'n at 25 (quoting SAC ¶¶ 149-151).) Plaintiff also contends that loss causation occurred in the form of a "run on the Fund." (*Id.* at 26.) That run began when the Fund's emphasis on mortgage-related securities caused a decline in the Fund's NAV. The decline then caused investors to liquidate their shares of the Fund en masse, which put pressure on the Fund to liquidate its securities at a time when the mortgage-related securities market was illiquid, which then caused the eventual liquidation of the Fund.

Plaintiff's theory of the case is not without support in the case law. Indeed, the court in *In re Charles Schwab Corp. Securities Litigation*, 257 F.R.D. 534 (N.D. Cal. 2009), put forth those exact same theories. There, the defendant advanced a theory very similar to State Street's. The *Schwab* court did not find that argument persuasive:

> Defendants' narrow formulation of loss causation would effectively insulate mutual fund companies from claims for a wide range of material misrepresentations regarding fund policies, risks and investment decisions. Defendants would immunize a scheme that purported to invest in low-risk

11

> government bonds but in fact invested in legitimate but high-risk treasure-hunting expeditions. Loss causation, however, is not limited to the common "corrective disclosure-price drop" scenario.

257 F.R.D. at 547. The court found that "plaintiffs certainly alleged that the *subject* of the fraudulent statements caused their losses—that defendants misrepresented or failed to disclose portfolio risks, the materialization of which caused (or exacerbated) the losses." *Id.* The court also found that "[o]ther causation theories" were also "conceivable," such as the "run on the fund" scenario, and a theory that "if defendants misrepresented the scope of the fund's risks, and the undisclosed risks exacerbated the losses, then plaintiffs' resulting undervaluation of risks might be deemed to have caused some portion of their losses." *Id.* In *In re Evergreen Ultra Short Opportunities Fund Securities Litigation*, 705 F.Supp.2d 86 (D. Mass. 2010), the court cited *Schwab* approvingly and went a step further than the *Schwab* court in crediting the plaintiffs' allegations that "the defendants made false representations about the riskiness of the Fund's investments and artificially inflated the NAV throughout the Class Period." 705 F. Supp. 2d at 95. Thus, "[w]hen the defendants' alleged misstatements were ultimately revealed, the NAV declined in value, resulting in losses to the Fund." *Id. Rafton v. Rydex Series Funds*, No. 10-CV-01171-LHK, 2011 WL 31114 (N.D. Cal. Jan. 5, 2011), also followed *Schwab*'s rationale, in its words, "for good reason." 2011 WL 31114, at *11. It rationalized that following State Street's theory would "lead to the absurd result that such funds could even *intentionally* misrepresent material facts with impunity." *Id.* (emphasis in original). Plaintiff relies heavily on this line of decisions; indeed, the SAC's pleadings mirror *Schwab*'s articulation of loss causation theories in mutual fund securities litigation.

Not all district court opinions support plaintiff's position. In *In re Morgan Stanley Mutual Fund Securities Litigation*, No. 03 Civ. 8208 (RO), 2006 WL 1008138 (S.D.N.Y. Apr.

18, 2006), the court rejected the plaintiffs' loss-causation argument. The plaintiffs in that case asserted that had they known that certain charges were not being used to benefit the funds in that case, but were being used in other programs, "the value placed on [the] shares [of the funds] at the time of the purchase would have been less." *Id.* at *9. According to plaintiffs, this resulted in an overvaluing of the fund. The court rejected the argument:

> This theory is incorrect as a matter of law. Unlike an ordinary share of stock traded on the open market, the value of a mutual fund share is calculated according to a statutory formula. Share price is a function of "Net Asset Value", the pro-rata share of assets under management, minus liabilities such as fees. Plaintiffs explain no mechanism by which a mutual fund share's price could differ from its objective "value." The cases plaintiffs cite to support this proposition are inapposite, because they deal with securities whose price is not set by statute and therefore can be affected by market manipulations.

*Id.* Similarly, in *In re Salomon Smith Barney Mutual Fund Fees Litigation*, 441 F. Supp. 2d 579 (S.D.N.Y. 2006), plaintiffs alleged that defendants steered them into mutual funds with lower returns than those they would have received had defendants directed them toward funds that were in their best interests; that as a result they purchased inferior funds they otherwise would not have purchased; and that consequently they received a return that was substantially less than they would have received on a different fund. 441 F. Supp. 2d at 589. The court held that "[t]he 'loss suffered' of course refers to diminution of value of the mutual fund share and, here, Plaintiffs make no such allegations and, indeed, they cannot." *Id.* at 589-90. These cases focus on whether the misstatements alleged affected the NAV of the mutual funds, consistent with State Street's theory of the case.

The Court, somewhat reluctantly, agrees with State Street, and begins its analysis with the text of the statute. Section 11 measures damages as:

> the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been

13

> disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.

15 U.S.C. § 77k(e).  Such damages are not recoverable to the extent that they represent amounts "other than the depreciation in *value* of such security *resulting from* such part of the registration statement . . . not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Id.* (emphasis added); *see also id.* § 77*l*(b) (precluding recovery for any amount that "represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication . . . not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading").  This statutory scheme envisions material misrepresentations in the prospectus inflating the market price of the security at the time of the statement.  When the nature of the misrepresentation is revealed, whether by the issuer or by other circumstances, the market corrects the price of the security to the value it would have had absent the misrepresentation.  Thus the statute awards as damages the difference between the two prices—the purchase price reflecting the inflation associated with the material misstatement and the latter reflecting the market correction after disclosure (whether at the time of sale or at the time of suit)—to approximate the value of the loss caused by the material misstatement.

"[P]laintiffs bringing claims under sections 11 and 12(a)(2) need not allege . . . loss causation," *In re Morgan Stanley Info; Fund Sec. Litig.*, 592 F.3d at 359, but "[s]ection 11(e) makes the absence of loss causation an affirmative defense." *NECA-IBEW Health & Welfare Fund*, 743 F. Supp. 2d at 291.  The loss causation affirmative defense recognizes that other market forces can also contribute to the depreciation in the value of a security and allows

defendants to isolate the loss caused by their material misstatement. *Dura* recognized this paradigm in the "corrective disclosure-price drop" scenario; *Lentell* recognized it in the "materialization of the risk" scenario.

In this statutory scheme, it is crucial that there be a revelation of the concealed risk and that the revelation cause a depreciation in the value of the security. The importance of these elements can be illustrated with a simplified example. Suppose two individuals, P1 and P2, purchase shares of a mutual fund for $50 a share at the same time. The fund's prospectus contains a material misrepresentation. P1 sells his shares on Tuesday for $55 a share. On Wednesday, the shares of the fund fall to $25. On Thursday, P2 sells his shares for $25 a share. P1 and P2 are analytically indistinct, except that P2 suffered a loss and P1 did not. If we say that the material misrepresentation "caused" P2's losses, this leads to a paradox: both P1 and P2 are subject to the same "proximate cause," yet one has a legal cause of action and one does not. Indeed, the measure of P1's damages under Section 11 would result in a negative number. *Lentell* and *Dura* first remove the paradox by distinguishing transaction causation and loss causation. P1 and P2 are both subject to the same "transaction cause," but not to the same "loss cause." *Lentell* and *Dura* then resolve the paradox by inserting the revelation of the information hidden by the material misrepresentation on Wednesday, which analytically separates the causation analysis for P1 and P2. The material misrepresentation still "causes" P2's loss, however, in the sense that it is the revelation of information that the misrepresentation concealed that prompts the difference between P1 and P2's selling prices.

The same cannot be said with the reasoning used by *Schwab*, *Evergreen*, and *Rafton*. These cases attempt to resolve the paradox by inserting "the subprime mortgage crisis happened" into the hypothetical Wednesday. With respect to the question of whether the material

15

misstatement caused the plaintiff's losses, however, this again renders plaintiffs who sold their shares before the mortgage crisis and those who sold after the crisis analytically indistinct. It cannot be maintained that the material misrepresentation has the same causal relationship with the subprime mortgage crisis as it does to the revelation of information that it concealed. Indeed, these cases appear to be reasoning from effect to cause, as each begin their arguments about loss causation with a policy rationale. *See Rafton*, 2011 WL 31114, at *11 (avoiding an "absurd result"); *Evergreen*, 705 F. Supp. 2d at 95 (reiterating *Schwab*'s argument that the "narrow formulation" of loss causation would "effectively insulate mutual fund companies from claims for a wide range of material misrepresentations"); *Schwab*, 257 F.R.D. at 547 (same); *see also* Mercer E. Bullard, Dura*, Loss Causation, and Mutual Funds: A Requiem for Private Claims?*, 76 U. Cin. L. Rev 559, 573, 577 (2008) (noting that "only a federal mutual fund claim alleging misrepresentations regarding the accuracy of the fund's NAV appears to have any chance of surviving a motion to dismiss in a federal court in New York" but arguing that the "logical structure of private claims" dictates that "'value' and 'loss' must refer to some measure of value other than the fund's share price"). That is, because plaintiffs suffered a loss, and because defendants made some statement that is related to that loss, the statement must have caused the loss. This reasoning makes the policy rationale—*i.e.*, that mutual fund issuers ought to be subject to private securities fraud claims, and any other construction would be "absurd"—guide the legal analysis, and results in an extension of *Lentell*'s holding that ignores its precise causation analysis.

   Plaintiff's position certainly has an appealing element to it. The mutual fund issuer misrepresented the composition of the portfolio, concealing the fact that it might not be as diversified as the prospectus indicates—this constitutes the "risk." Later, the sector to which the

fund is overexposed collapses, the Fund's NAV drops, and thereby the risk "materializes." But this reading of *Lentell* is a bit too facile. Plaintiff's argument in this case might suffice to plead the foreseeability portion of *Lentell*'s loss-causation analysis; that is, it could be construed as alleging that "the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor," namely, the risk of non-diversification and overexposure to the mortgage-related securities market. *Lentell*, 396 F.3d at 173. Where *Schwab*, *Evergreen*, and *Rafton* falter in their analysis, however, is on the second part of the inquiry—whether "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173 (internal citation omitted); *see also Vivendi*, 634 F. Supp. 2d at 364 ("Once an event qualifies as a materialization of the risk, plaintiffs must still prove that their losses were caused by that event."). *Evergreen*'s analysis, for example, cannot be correct. Because the NAV is calculated according to a statutory formula, it cannot be that misstatements by the fund's issuer "artificially inflated the NAV." 705 F. Supp. 2d at 95. Because there is no secondary market for a mutual fund's shares, statements by a fund's issuer have no ability to "inflate" the price of the fund's shares. The Court, therefore, holds that this theory does not adequately plead loss causation. Neither is plaintiff's "run on the Fund" theory availing. In that theory, plaintiff's losses are still caused by a falling subprime mortgage market. It may be true that the run on the Fund applied pressure to the Fund to liquidate, but that liquidation only causes losses because of the decreasing value of the Fund's underlying securities.

     The Court concludes that defendants have satisfied their burden of pleading facially apparent negative loss causation. The statute restricts damages to those depreciations in the

NAV that actually *result from* the materialization of a risk contained within a material misstatement, not to those that are somehow connected with the misstatement or even those that are simply "within the zone of risk" of the misstatement.  In so concluding, the Court notes that it is bound by the text of sections 11 and 12.  Section 11 provides "only one measure of damages," *In re Mutual Funds Inv. Litig.*, 384 F. Supp. 2d 845, 866 (D. Md. 2005), namely one based on a price difference between the amount paid for the security and its value at a later time.  15 U.S.C. § 77k(e).  Similarly, Section 12(a)(2) precludes recovery for amounts "other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication . . . not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading."  *Id.* § 77*l*(b).  Both sections tie the recovery of a potential plaintiff to the value of the security, and plaintiff's theory of loss causation here is divorced from that statutory language.

It is the causal connection between the misrepresentation and the drop in the value of the security that Congress put in the statutes' text, and the policy arguments advanced by *Schwab* and its progeny are unavailing in the face of that text.  Even if the Court could consider an argument about "the absurd result that [mutual] funds could even *intentionally* misrepresent material facts with impunity," *Rafton*, 2011 WL 31114, at *11, that argument is better directed at a section 10(b) claim, a provision repeatedly described by the Supreme Court as a "catchall provision" of the securities fraud laws.  *See, e.g.*, *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 174 (1994) (noting that "Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud"); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) ("Although limited in scope, Section 11 places a relatively minimal burden on a plaintiff.  In contrast, Section 10(b) is a 'catchall' antifraud provision, but it requires a

18

plaintiff to carry a heavier burden to establish a cause of action."); *Chiarella v. United States*, 445 U.S. 222, 226 (1980) ("Section 10(b) was designed as a catch-all clause to prevent fraudulent practices."). In this case, however, the Court is constrained by the plain language of sections 11(e) and 12(a)(2), which requires a connection between the alleged material misstatement and a diminution in the security's value. It seems likely that Congress never considered that it might be creating a loophole for fraudulent misrepresentations by mutual fund managers when enacting these provisions. *See* David M. Geffen, *A Shaky Future For Securities Act Claims Against Mutual Funds*, 37 Sec. Reg. L.J. 20, 36-37 (2009). But if this is so, closing the loophole requires legislative action. Here, where the NAV does not react to the any misstatements in the Fund's prospectus, no connection between the alleged material misstatement and a diminution in the security's value has been or could be alleged. Accordingly, plaintiff's claims in this action, which all depend on the viability of stating a Section 11 or 12 claim, must be dismissed.

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motions to dismiss [78, 80] and dismisses the case with prejudice. The Clerk of the Court is requested to close this case.

SO ORDERED.

Dated: New York, New York
      March **31**, 2011

                                            Richard J. Holwell
                                          United States District Judge